NAYLOR et al. v. FOREMAN-BLADES LUMBER CO. et al.

(District Court, E. D. North Carolina. January 1, 1916.)

No. 337.

1. CANCELLATION OF INSTRUMENTS ☞34(1)—LACHES—LOSS OF EVIDENCE.

Complainants brought suit for the cancellation of a deed purporting to have been executed by them seven years before, and which they claimed had been forged by, or at the instance of, their grandfather. They admitted having acquired knowledge of the deed five years before suit, and while the grandfather and the person before whom their acknowledgment purported to have been taken were living; but their grandfather died during such time, and the person who certified to the acknowledgment shortly after suit was commenced, and before trial. There was evidence that the uncle of complainants, who was their representative and legal advisor, communicated with his father and with such other person in regard to the matter; but it was not shown what they claimed, or what transactions took place in respect thereto. During such time the deed was also accidentally destroyed by fire, and one of the defendants under a deed of which complainants had knowledge cut and removed the timber from the land. The evidence was also unsatisfactory in other respects, and many facts in regard to the bringing of the suit, which should have been frankly disclosed, were withheld. *Held* that, under the facts shown, the unexplained delay in bringing suit constituted such laches as deprived complainants of the right to invoke the aid of a court of equity, and required that court to remit them to their remedy by an action at law; defendants being in possession.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 49, 50, 52; Dec. Dig. ☞34(1).]

2. EQUITY ☞64, 72(3)—MAXIMS—LACHES—DEATH OF PERSONS CHARGED WITH MISCONDUCT.

Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no

excuse for his laches in asserting them; and the rule is especially to be enforced where the right to relief is based on the alleged fraud or criminal acts of persons who have died during the period of delay.

[Ed. Note.—For other cases, see Equity, Dec. Dig. ⟨⟩64, 72(3).]

In Equity. Suit by Harold J. Naylor, Clara C. Cole, and Lillian F. Naylor against the Foreman-Blades Lumber Company and Mary Robbins. Dismissed without prejudice to an action at law.

S. Brown Shepherd, of Raleigh, N. C., and M. H. Tillitt, of Norfolk, Va., for plaintiffs.

E. F. Aydlett, of Elizabeth City, N. C., for defendants.

CONNOR, District Judge. The jurisdiction of the court is sustained by reason of diversity of citizenship. The equitable jurisdiction of the court is found in the character of the relief invoked. The subject-matter of the controversy is a tract of land, chiefly valuable for the timber standing and growing upon it, at the time of the transactions disclosed in the pleadings and evidence, lying and being situate in Pasquotank county, N. C., containing 2,500 acres and, with the timber, of value largely in excess of $3,000, alleged by plaintiffs to be "more than $100,000."

The bill charges: That plaintiffs Harold J. Naylor and Clara C. Cole, the children of plaintiff Lillian F. Naylor, are seised in fee of the lands in controversy. That defendant Mary Robbins asserts title thereto, claiming to be the owner, and in possession thereof, by virtue of certain deeds to which special reference is hereafter made. That defendant Foreman-Blades Lumber Company, claiming the right to do so by reason of purchase from defendant Mary Robbins, entered upon the land and cut and removed timber therefrom of great value. Plaintiffs Harold J. and Clara C. pray: That the alleged deeds under which defendant Mary Robbins claims title be declared invalid and canceled, being a cloud upon their title. That defendant Foreman-Blades Lumber Company account for the timber cut and removed from the land and pay to them the value thereof. Plaintiff Lillian F. Naylor avers that her coplaintiffs are the owners of the land, 'and that, by virtue of the reservation of the timber thereon in the deed executed by her to them, she is the owner of and entitled to recover of defendant Foreman-Blades Lumber Company, the value thereof. She further says that, if her coplaintiffs are not the owners of the land, she is seised thereof in fee, and asks that the deeds under which defendant Mary Robbins claims be canceled. The question whether there is not a misjoinder of parties plaintiff, and the bill multifarious, is not raised by the defendants.

Passing these questions, it becomes necessary to examine the deeds under which plaintiffs and defendants claim title. Prior to March 24, 1896, Harvey Terry was the owner of a large body of timber land, containing 12,338 acres, in Mt. Hermon township, Pasquotank county, N. C., known as a part of the "Great Park Estate," or "Terry's Manor." A survey of this land was made by H. T. Greenleaf and recorded in the office of the register of deeds of said county. The plat shows that the tract was divided into squares, numbered from

1 to 318, containing 400 acres each. The description in the several deeds hereinafter set out refer to this survey.

On March 24, 1896, Harvey Terry conveyed the entire tract of 12,-338 acres to Thomas H. Robbins, of Brooklyn, N. Y.; the consideration recited in the deed being "one dollar and other valuable considerations." On June 16, 1896, Thomas H. Robbins conveyed to his son, W. A. Robbins, a portion of the tract containing 1,160 acres. On June 16, 1896, T. H. Robbins conveyed to his daughter, plaintiff Lillian F. Naylor, a portion of the tract containing 1,160 acres. On November 11, 1897, W. A. Robbins conveyed the same land to his mother, Adelia Robbins. On December 8, 1897, plaintiff Lillian F. Naylor conveyed the land conveyed to her by Thos. H. Robbins to her mother, Adelia Robbins. Each of the deeds recites a consideration of "one dollar and other valuable considerations," and are duly recorded in the office of the register of deeds of Pasquotank county.

. On August 31, 1897, plaintiff Lillian F. Naylor executed to her father Thomas H. Robbins a power of attorney, empowering him as her attorney in fact "to convey, mortgage, and make any other disposition which he should deem proper, all real or personal property, lands, timber of whatsoever nature, now owned, or to be owned, by me in the state of North Carolina." This power of attorney was duly recorded in Pasquotank county September 9, 1897. On January 3, 1898, Thomas H. Robbins and his wife, Adelia, conveyed the entire tract of 12,338 acres to Annie Champion, for the same recited consideration. On January 29, 1898, Annie Champion conveyed the entire tract to plaintiff Lillian F. Naylor for the same recited consideration. On May 1, 1898, Lillian F Naylor, for the same recited consideration, conveyed to plaintiffs Harold J. Naylor and Clara C. Cole (then Naylor) the portions of the tract numbered on said plat from 1 to 62 inclusive, containing 2,500 acres. On April 25, 1902, Lillian F. Naylor, for the same recited consideration, conveyed to Lewis Leavens the entire tract conveyed to her by Annie Champion, containing 12,338 acres. This deed contains no exception of the portion conveyed to plaintiffs May 1, 1898. All of these deeds are duly recorded.

The registry of deeds of Pasquotank county discloses the registration of a deed from plaintiffs Harold J. Naylor and Clara C. Cole to their mother, Lillian F. Naylor for the portion of the original tract which was conveyed to them by said Lillian F. Naylor May 1, 1898. This deed bears date January 1, 1906; consideration recited, "two dollars"; acknowledged before V. Comfort, commissioner of deeds, February 14, 1906; certificate of T. Hartzheim, clerk of Kings county, N. Y., Supreme Court, February 14, 1907; ordered to registration upon the certificates attached by the clerk of the superior court, and recorded in the office of the register of deeds of Pasquotank county, February 21, 1907.

. Plaintiffs Harold J. Naylor and Clara C. Cole aver that they never signed or acknowledged the execution of this deed. They allege that, if said deed purported to be signed by them, such signatures were forged. On May 31, 1907, Lillian F. Naylor, by Thomas H. Robbins, her attorney in fact, conveyed the same land to defendant Mary Rob-

bins, then Mary Brandeth; the recited consideration being $2,500. On August 8, 1907, Thomas H. Robbins and his then wife, Mary Robbins, in consideration of $10,000, conveyed to defendant Foreman-Blades Lumber Company, the standing timber on said land, of the dimensions named in the deed. This deed was duly proven and recorded August 12, 1907, in the office of the register of deeds of Pasquotank county. The corporation was given five years within which to cut the timber. It began cutting during the year 1909 and finished April, 1911. These deeds were duly recorded.

The controversy, primarily, centers upon the charge made by plaintiff Lillian F. Naylor that her father, and by Harold and Clara that their grandfather, Thomas H. Robbins, on January 1, 1906, forged, or caused to be forged, the names of plaintiffs Harold J. and Clara C. to the deed found on the record to Lillian F. Naylor, and that Virgil Comfort, the commissioner, who certified that they acknowledged their signatures in his presence, was a party to, and actively participated in, the commission of the forgery. The charge is clearly made and clearly denied. So far as the plaintiffs Harold J. Naylor and Clara C. Cole are concerned, the establishment of this charge is essential to their claim of ownership of the land in controversy. The claim of Lillian F. Naylor is dependent upon the establishment of other contentions.

Before proceeding to examine the evidence upon which the decision of this vital question is based, and the relief prayed by plaintiffs sought to be established, it will be well to note a few facts in respect to which there is no controversy. The plaintiffs paid nothing to Thomas H. Robbins, nor to their mother, for the land. Thomas H. Robbins died December 26, 1911. Virgil Comfort died December 7, 1913. Neither Mrs. Naylor nor either of the other plaintiffs, at any time, listed the land for taxation, nor paid any tax thereon. Virgil Comfort, the commissioner, who certified that the execution of the deed was acknowledged before him, also took the probate of the other deeds herein set forth, except that from Terry to Robbins and Robbins, attorney for Mrs. Naylor, to Mrs. Brandeth. Plaintiffs have never been in possession of, or exercised control over, the land. They allege that Mrs. Robbins claims to be in possession, and she admits that she is in possession, claiming under the deed executed to her May 31, 1907.

The original deed, which purports to have been signed by plaintiffs Harold J. and Clara C. January 1, 1906, was burned in the dwelling of Thomas H. Robbins when it was destroyed by fire December 22, 1910. The bill herein was filed November 12, 1913. It is manifest that, for some reason, Thomas H. Robbins, who purchased the entire tract from Terry March 24, 1896, kept the title thereto in transit, with two exceptions, within his immediate family, retaining at all times control of the title and of the land. Mrs. Naylor says that he put the title in her "to hold for him." She says that the 2,500 acres was given to her "in consideration of being cut off by my husband's uncle's will; that is why it was given to me"; that Annie Champion "was a dummy that my father used, so that she could go on bonds and be liable; that the title was placed in her for him."

The testimony upon which plaintiffs rely to establish the charge of

forgery is largely that of Mrs. Lillian F. Naylor, William A. Robbins, and themselves. It appears that Mrs. Naylor was, during the time of the transactions in controversy, a widow, and that she and her children, together with her brother, William A. Robbins, resided at 178 Garfield Place, Brooklyn, until Harold left home, when about 18 years old. Mrs. Naylor was general guardian for her children, and her brother, W. A. Robbins, was at all times her and their attorney. Mrs. Naylor says that her daughter was born May 21, 1884, and her son October 25, 1885; hence he was not of full age on January 1, 1906. He left home when 17 or 18 years of age, going to California, and from there to Denver, finally going to Ft. Worth, Tex.; that he was there January 1, 1906; that he was at home during the spring of 1905; that he made his next visit home after her daughter was married, which was in April, 1906; "it was the next spring; it must have been in 1907."

Mr. Robbins, in his deposition, testified that "the first time he [Harold] visited Brooklyn, after he took up his residence in Ft. Worth, was in 1909; he had been in Ft. Worth all that time." Mrs. Naylor, who heard Mr. Robbins testify, was recalled and testified, in her deposition, that she was mistaken in saying that her son came home during the spring of 1907; that it was 1909. It will be observed that she had fixed the date as being "the spring after my daughter was married," and this, she says, was in April, 1906. Harold J. Naylor says that he was in Brooklyn about a month during May, 1909; that he was in Ft. Worth during the months of January and February, 1906, and in this he is strongly corroborated. It is conceded that Clara C. Cole, then, Naylor, was with her mother in Brooklyn on January 1, 1906. She admits that her mother wrote her of the existence of the deed "four or five years" prior to November, 1914, and in this she is corroborated by her mother and her uncle.

Harold says that he first heard of the deed "eight months or a year ago." This statement was made in his deposition October 6, 1914. Mrs. Cole testifies, upon her deposition, November 6, 1914, that she saw her brother, according to her recollection, "in Ft. Worth a year ago last January; the next time two or three years before that in Brooklyn, N. Y., and the next time as much as four years before that in Brooklyn." She is asked, "Then, according to your best recollection, the third time from this that you saw your brother was some eight or nine years ago in Brooklyn?" to which she answered:

"Yes; it was all of ten years ago." "Have you not seen him, then, but three times in ten years?" "No." "How many times have you been to Brooklyn, N. Y., since April, 1906?" "I have been there a number of times; I don't know how many." "Have you averaged once a year?" "Sometimes I would stay almost a year there." "About how much of the time since April, 1906, to this time, have you spent in Brooklyn, N. Y.?" "Maybe, all told, a year."

Harold J. Naylor, under cross-examination, upon his deposition taken October 6, 1914, was asked and answered the following questions:·

"When did you first hear that you ever had any deed for any of the land in controversy?" "Eight or ten months ago." "That was the first time that

you ever heard that your mother conveyed any lands to you?" "Yes." "Who gave you that information?" "My uncle, William A. Robbins." "Where does he live?" "In Brooklyn, N. Y." "How did he come to give you that information?" "In a letter he stated to me that the property had been deeded to me and my sister, and that the timber was being taken off, and that he thought it was up to us to assert our rights." "Have you the letter?" "I have," "Will you furnish a copy of it to be filed with your deposition?" "I think I can. I am pretty sure I had it. I think I have it." "Will you furnish a copy of it to be filed with your deposition?" "Yes." [No copy of the letter is filed.] * * * "Mr. Naylor, Lillian F. Naylor lives where?" "In Brooklyn, N. Y." "Does she and your uncle live together?" "They do." "How long since you saw your mother?" "I saw her last summer, in September." "Where?" "In Brooklyn, N. Y." "Was that before you brought suit?" "That was after." "Did you have any conversation with your uncle and your mother about bringing this suit when you were in Brooklyn last summer?" "I did not think it was necessary, as I understood the suit was already instituted." "My question is: Did you ever have any conversation with either your uncle or your mother about this suit?" "Not that I remember." "Did you have any conversation with your uncle about arrangement with the Richmond Cedar Works?" "None at all." "Is your uncle paying the expense of this lawsuit?" "I understand—in fact, I know—that he made an agreement with the lawyers under contract with contingent." "He is to be responsible for the cost?" "Not that I know of." "When did you see your mother before last September?" "About 1903, about a year before I came to Ft. Worth." "Are you and your sister on friendly terms?" "Yes." "Has there ever been any unfriendly terms between your mother and you and your sister?" "No."

The bill herein was verified by plaintiff Harold J. Naylor June 10, 1913, and filed November 12, 1913. Mrs. Naylor says that, when informed by her brother of the existence of the deed, she told him, a practicing attorney, to do what he thought best, and wrote her daughter, asking her "if she ever signed such a deed, and she said she never had." She further says that, "when I first knew it, I spoke to her about it." Mrs. Cole was then 23 years of age and Harold was 22. To the question whether she saw her father, or had any communication with him, after learning of the existence of the deed, she said, "Once." This question was asked on direct examination, and no further inquiry was made in that respect.

The deposition of W. A. Robbins was taken and read in evidence. He says that he has been acting as counsel and was also appointed guardian for plaintiffs Clara and Harold—was counsel for Mrs. Naylor, guardian; that he spoke to plaintiffs, during their minority, of the deed executed by their mother, conveying the land to them. After testifying in regard to Harold's visits to Brooklyn, he concludes:

"Harold left Brooklyn—I saw him off on the train—in 1904. His first visit after that was in August, 1905. At that time he was living in Colorado; he was here only a few days; then he returned West, and the second time he came back to Brooklyn was in May, 1909. It may have been 1908. He made another visit afterwards; that was in September, 1913."

Mrs. Naylor says that he came to Brooklyn the spring after her daughter was married—April, 1906. It is true that, after hearing her brother's evidence, she says that she was mistaken; that his visit was in 1909. Harold is asked, "Where did you see your mother before last summer?" and answers, "About 1903; about a year before I came to Ft. Worth." He says that he spent a month and four days

in Brooklyn in April and May, 1909. Mrs. Cole says that she spent three or four months in Ft. Worth, Tex., "two years ago in January." This statement was made November 25, 1914. Mr. Robbins says that he has been "acting continuously as attorney for these children and his sister"; that "she has frequently, many times," talked to him about the property. "The first time I knew of the existence of any such deed was some time in the winter of 1908. I had written to the register of deeds of Pasquotank county, asking him to examine the records, and if he found any conveyance from the children to send me copies of the instruments, and he returned me copies of certain papers. That was the first time I knew of the existence of this deed. I informed my sister of what I had found, and told her about the deed I found had been recorded from her children to her, and asked her if she knew anything about it; and she said, 'No,' and I instructed her to write to the children, and find out at once if they had signed the deed. I wrote immediately; as soon as I found out, I wrote to my father, and also to Mr. Comfort"—by registered letter; have letter press copies, which were produced and filed. These letters were taken from the letter book of Mr. Robbins. The book was not produced. From these letters it appears that on April 8, 1908, he wrote his father, Thomas H. Robbins, Washington, D. C.:

"Dear Father: The delay in making this reply to your letter of the 23d of last January is due to the fact that I have been waiting the completion of the examination of the title to the land in Pasquotank county, North Carolina, owned by the children. The revelations disclosed are staggering, actually sickening, on account of the probable criminal consequences to those responsible for the existence of these deeds. We have consulted over this latest transaction, weighing the terrible consequences, and, in view of past transactions, together with your statements to Lillie, when you last talked with her, we have decided you have gone too far, and have come to the painful conclusion to commence an action to set this alleged Naylor-Naylor deed aside on the ground of forgery, unless the children and Lillie are restored within the next few days to the same rights and position they enjoyed as to this land in connection with all persons at the time when the alleged deed from the children to their mother purports to have been dated. Nothing whatever has yet been said to the Foreman-Blades Lumber Company, in order that you may have no obstacles in your way to an adjustment of matters with them, as has just been suggested, which will not really arise when once the facts are made public. But unless this restoration is made speedily, or immediate steps taken for that purpose, I shall have to initiate matters myself to have those rights restored by court, in which case I shall have no control over the other probable results. All this is without waiving any right or claim on the part of Lillie for an accounting from yourself and the grantee mentioned in the deed, bearing date May 31, 1907, you made and claim to have executed as attorney for her, to recover the consideration mentioned therein in case it is found necessary or desirable thus to collect the same. And I am further instructed by Lillie to give you notice that any and every power of attorney from her to you has been revoked by her by a duly executed revocation dated March 11, 1908, and recorded March 14, 1908. I do not agree with you at all as to what are the rights of the children to this timber tract. The considerations to uphold the deed are numerous, valuable, and ample. The deed was made at your own suggestion, and received in good faith and credence, absolute and without any secret reservation or understanding; nor did you consider there was any such at the time you filed your schedule in bankruptcy, or the same would have appeared among the assets you claimed. It has been only since that we have heard any such claim. As a matter of fact, the only actual reservation appears in the deed itself; a possible logging contract, subject to an accounting to the chil-

dren, for the value of the timber when removed, which was not to last indefinitely. You write that the children and Lillie have never paid any interest or taxes upon the land. Even so; you seem to forget that I never received one cent in consideration for the 1,160 acres or more I owned of the most valuable part of the tract, which I turned over for your benefit. It was intended, upon making the conveyance to the children, that the burden of any mortgages covering their tract should rest upon the balance of the tract covered by such mortgages, as by law is the case, under the principle of inverse order of alienation. Any equities as to taxes the children stand ready to adjust when the time arrives for a settlement of this matter. The validity of the alleged Naylor-Naylor deed will not stand even the first test, for at its date Harold was *not yet of age* and was in Texas at the time it purports to have been acknowledged in New York. Comfort, too, has thus made himself criminally answerable in this matter, and it will be useless for him to appeal to me to abandon action to set this deed aside when once started. My duty is to the children and Lillie.

"Very truly your son,                                    Will."

The postal receipts show that this letter was received by Thomas H. Robbins April 9, 1908. On the same day Mr. Robbins wrote Virgil Comfort:

"Dear Mr. Comfort: It has been lately discovered that there is a paper on record in the office of the register of deeds for Pasquotank county, N. C., which purports to be a deed dated January 1, 1906, executed by Clara C. Naylor and Harold J. Naylor to Lillian F. Naylor, conveying some 2,500 acres of timber land in said county. These said named grantors claim they never signed nor acknowledged the execution of this paper, so it will doubtless be my painful duty to bring an action to set this paper aside on the ground of forgery, unless my father can succeed in restoring these parties to just the same rights they enjoyed at the time this paper is dated, a proposition which I have just written him, but which I fear cannot be carried through, even if he should realize the necessity for it, which I hardly expect until too late, after the facts have become public. Once these facts come out, and there will doubtless be criminal prosecutions following at the instance of the Foreman-Blades Lumber Company, a matter that exceedingly worries me. But even so my duty rests with my niece, nephew, and sister. As I am going to wait only a few days to have this matter adjusted in the way I have suggested, it seems to me if you can think of any other way out of the trouble, which has escaped me, that it would be of vital interest to you to see me at once about it, for the acknowledgments, I should add, purport to have been taken before you, which was a physical impossibility, since Harold J. Naylor was then, as now, living in Texas. I do not care to discuss this disagreeable affair at my office, but expect to be at home every evening up to half past 7, excepting next Friday."

This letter was received by Comfort on April 9, 1908. Immediately following the production of the letter press copies of those two letters, plaintiff's counsel asked Mr. Robbins the question: "As counsel, what action did you take in the matter?" To which he answered, "I had suit brought; employed counsel and brought suit." He is not asked, and nothing is said, in respect to any reply to the letters, if any was received, nor of any interview with Comfort, pursuant to the invitation to visit the witness. The only evidence indicating what, if any, meeting was had with his father is in response to the question whether he saw his father "much after that," to which he responds, "From 1902 I saw very little of my father; he was seldom at the house; in the last six or seven years of his life I don't think he was there many times." It is evident, from the first lines of the letter to his father, that, prior thereto, some correspondence was had between them

in regard to this land. He refers to his delay in answering a letter of January 23d. This letter is not produced, nor its absence accounted for. Mr. Robbins expresses his dissent from the attitude of his father in regard to the children's claim to the property.

Mr. Robbins, on April 8, 1908, charges his father with the crime of forgery, depriving his grandchildren of a tract of land of 2,500 acres, "worth more than $100,000," as they allege, calling upon him to make some adjustment of the matter under a threat to institute suit, which will result in criminal proceeding, "in a few days." He also charges the official who certified the acknowledgment of the execution of the deed with criminal conduct, with a similiar threat. Without any explanation, without a suggestion as to the action of the parties charged with at least two felonies, he waits five years and eight months, until the father, who lived more than three years thereafter, is dead, before instituting suit. The commissioner, who lived more than five years, died within less than a month after the bill was filed. That Clara C. Cole knew of the existence of the deed is admitted. Although Harold J. Naylor says that he learned of it only "eight or ten months" prior to October 6, 1914 (December, 1913), he verified the bill June 10, 1913. His mother says that she wrote "them" very soon after learning of the deed, according to the directions of her brother, and he (Mr. Robbins) says that Mrs. Naylor informed him that she had communicated "with her daughter and son immediately after he had given her the information about these deeds." She told him that she had communicated with them "shortly afterwards—it may have been two or three weeks." Mrs. Naylor says that she has heard from her son "every week since he left home." In his letter to Comfort, Mr. Robbins writes: "These said named grantors claim that they never signed nor acknowledged the execution of this paper."

It is unthinkable that a son deliberately charged his father with forgery, and threatened to prosecute him, before he had received from the alleged grantors a denial of the execution of the deed by them. He says, in his letter, that they "claim that they had never signed it." It is difficult to resist the conclusion that Harold J. Naylor is mistaken—that his memory is at fault—when he says that he first heard of the existence of the deed "eight or ten months, or probably a year," before he testified (October, 1914). It may, for the purpose of this discussion, be safely concluded that all of the parties interested, and their uncle and attorney, knew, not later than April 8, 1908, of the existence of the deed. It is manifest that they were not restrained by the consideration of relationship, regard for their father, or the result to him, of the exposure of his alleged criminal conduct. It is difficult to reach the conclusion that any man would rest under the charge of forgery, made by his own son, with the threat of exposure "in a few days," or that Comfort was willing to remain quiescent under the threat made by a lawyer, who, as his letter stated, had weighed the consequences to his own father, to prosecute a charge which, if true, would have subjected them both to a term of the state prison. The copies of deeds and other evidence, introduced in this case, show that he had been the trusted friend of Thomas H. Robbins and his

family, taking the acknowledgment of the various deeds to and from each other. He lived more than five years after the charge was made, with an invitation to visit W. A. Robbins at his home, for the purpose of suggesting some way of adjusting the matter. The bill was verified June 10, 1913, but not filed until November 12, 1913. Why, after taking this action, was this delay? Why was not the bill filed and the deposition of Comfort taken before his death? He lived two years after the death of Thomas H. Robbins. His age and the condition of his health does not appear. Why was not suit brought, as threatened, and the production of the original deed demanded, and thereby, if true, the forgery demonstrated. The transaction, with all of the "conveying" and "reconveying" of this land, is clouded in mystery.

On April 25, 1902, Lillian F. Naylor conveyed the entire tract of 12,338 acres to Leavens, making no exception of the 2,500 acres which she had theretofore conveyed to her children, and on September 1st of the same year Leavens conveyed the tract to Thomas H. Robbins. Mrs. Naylor's description of Annie Champion as a "dummy" is significant. It is evident that nothing of value passed between the grantors and grantees, and that the control of the land and timber at all times remained in Thomas H. Robbins. It appears, from some of the deeds and contracts in evidence, that mortgages on the land were outstanding for large amounts, and from the letter of W. A. Robbins to his father that Thomas H. Robbins, at some time during the period when the title was in transit, "filed schedules in bankruptcy." Neither of the plaintiffs, nor W. A. Robbins, their kinsman and attorney, at any time, listed the land for taxation, nor paid the taxes thereon. Mr. Robbins says that in 1908 he wrote some officer in regard to the taxes. No letter in that respect is produced, although he said that he had a copy; "that no taxes were due." They knew that, on May 1, 1907, Thomas H. Robbins, acting under the power of attorney executed by Lillian F. Naylor, had conveyed the land, for a recited consideration of $2,500, to Mary Brandeth, with whom he very soon thereafter intermarried. They also knew that on May 8, 1907, Thomas H. Robbins and Mary Robbins sold the timber to the defendant Foreman-Blades Lumber Company. All of these deeds were put to record immediately after their execution. On December 1, 1908, Mr. Robbins wrote the Lumber Company:

"My clients, Clara C. Cole, formerly Clara C. Naylor, and Harold J. Naylor, have only lately discovered, while negotiating a sale of their property in Pasquotank county, N. C., being about 2,500 acres of what is more commonly known as the Great Park Estate, or Terry Tract, that you are claiming the same under an alleged deed purporting to have been made by them to Lillian F. Naylor, bearing date January 1, 1906, and recorded in the office of the register of deeds for Pasquotank county, in Liber 30 of Deeds, at page 642. I am instructed by them to notify you that they do not recognize, acknowledge, or ratify in any way any such instrument or alleged conveyance upon the grounds, among many others, that the same was never executed by either of them (upon the face thereof the alleged acknowledgment appears to have been taken by a *commissioner of deeds* and not by some official authorized to take it); that at the date of said instrument and the alleged acknowledgment thereof Harold J. Naylor was a minor; that there was never any delivery of said instrument; that no consideration has ever been paid or received for the same. My clients have always claimed and as-

serted, and still claim and assert in full, all the rights, title, and interest they acquired under and by virtue of the deed to them from the said Lillian F. Naylor, dated May 1, 1898, and recorded June 13, 1898, in the said register's office, in Liber 19 of Deeds, at page 288. I am further instructed to notify you that they will hold you and your agents for all damages they have received, or may receive, by reason of any trespass, waste, or cutting or removing any timber from the land in question by you, or your agents, and that you and your agents are hereby forbidden to commit any such trespass or waste, or to cut or remove any timber from said premises. The reservation in said deed to them was simply a logging contract, giving a right of entry to cut timber then standing, which contract long since expired, any operation thereunder to be accounted for, and the net proceeds to be paid over to them. The said Lillian F. Naylor first learned of the record of said alleged deed at the same time it was discovered by her children. She never authorized or requested any such conveyance, and never paid anything for it. If you care to purchase my client's right, title, and interest to protect yourselves, I am willing to stop present negotiations for a reasonable time to entertain any reasonable proposition from you; otherwise, I shall proceed to consummate pending negotiations, if possible, or, failing in this, to take such steps as will be advisable to protect my client's interest and to recover any damages sustained by them to the premises."

Passing the unexplained fact that this letter is written eight months after the letters to Thomas H. Robbins and V. Comfort, it will be noted that Mr. Robbins says that his clients "have only lately discovered, while negotiating a sale of their property," the existence of the deed, and that he is "instructed by them" to notify the lumber company of their claim; whereas, Harold J. Naylor, at least twice in his deposition, says that he heard of the deed "eight or ten months" previous to October, 1914. This is the first and only reference in any of the letters, or the evidence, of a negotiation for the sale of the property. It is also worthy of note that; although the charge is made in the letters to Thomas H. Robbins and V. Comfort that the deed of January 1, 1906, is a forgery, Mr. Robbins, who, as an intelligent attorney, must have known that a statement of that charge to the lumber company would have put its officers at once upon inquiry and sent them to his father, who resided in Washington City and had the deed in his possession, makes no such charge in his letter. It would seem that he carefully avoids doing so. It is true that he says that his clients do not "recognize" any such "instrument" "upon the grounds, among many others, that the same was never executed by either of them." If he had said no more, the reasonable inference would have been that they denied *signing* the deed; no other reasons were necessary. He must have known that the *execution* of a deed involves something more than *signing*. That he did so, and had the distinction in his mind, is indicated by the reasons which he assigns for the claim that the deed was not executed. He says that it appears on the face thereof that the alleged acknowledgment was taken by "a commissioner of deeds, and not by some official authorized to take it"; that at the date of the instrument "Harold J. Naylor was a minor"; that there "never was any delivery of said instrument"; and that "no consideration was ever paid or received for the same." Why place the claim of his clients upon four grounds, three of which any intelligent lawyer would have advised the lumber company were invalid, and the other suggesting a plea of infancy, when the real ground was con-

clusive and easily ascertainable; every person having knowledge of its truth being alive and easily within reach of the officers of the lumber company. The alleged forged deed was then, and continued for two years thereafter, in existence. He refers to "present negotiations," and says that, unless some "reasonable proposition" is made within "a reasonable time," he will "proceed to consummate pending negotiations, if possible, or, failing in this, to take such steps as will be advisable."

In the search for a satisfactory explanation of this mysterious series of transactions, the question arises: What negotiations were pending, and with whom? It will be recalled that, in his letter to Thomas H. Robbins of April 8, 1908, Mr. Robbins writes that:

"We have decided you have gone too far, and have come to the painful conclusion to commence an action to set this alleged deed aside on the ground of forgery, unless the children and Lillie are restored *within the next few days* to the same rights," etc.

In his letter to Comfort he says:

"*I am going to wait only a few days to have this matter adjusted in the way I have suggested,*" etc.

Was this the negotiation referred to in the letter to the lumber company? Was the father, charged by his children with forgery, and his alleged accomplice, negotiating "an adjustment" of the "matter" for eight months, and was the negotiation still "pending"?

It will be observed that, in his letter to Thomas H. Robbins of April 8, 1908, W. A. Robbins expressly reserves the right "on the part of Lillie for an accounting from yourself and the grantees mentioned in the deed, bearing date May 31, 1907, you made and claim to have executed as attorney for her to recover the consideration mentioned therein, in case it is found necessary thus to collect the same." This language refers to the deed executed by Thomas H. Robbins, under the power of attorney of Lillian J. Naylor, to Mary Brandeth.

Defendant Mary Robbins testifies that she had known Thomas H. Robbins "since she was 12 or 13 years old; had known Harold J. Naylor and Clara C. Cole for about twenty years; met Mrs. Robbins and her children at same time; they spent Saturdays and Sundays at my sister's, where I spent the summer." She says that she knows the handwriting of Harold J. Naylor and Clara C. Cole; has seen them write "many times." She is shown the copy of the deed purporting to have been executed by them, and says that she has seen the original "a great many times; * * * handled it—in my home, Mr. Robbins' home—among Mr. Robbins' business papers"; that she saw it in Washington, and afterwards on the farm; that on December 22, 1910, the house was destroyed by fire; nothing was saved; the original deed was destroyed; it was probated by Virgil Comfort, commissioner of deeds. He lived in Brooklyn. He was her brother-in-law. She says that, in her opinion, the signatures on the original deed were the genuine handwriting of Harold J. Naylor and Clara C. Cole. Mr. Robbins had possession of numerous deeds of Mrs. Naylor and the children, when they held other property. She married Thomas H.

Robbins July 2, 1907. V. Comfort died December 7, 1913. "I think he took the probate of most of Mr. Robbins' papers, of every kind, for about 20 years." Witness was Thomas H. Robbins' housekeeper before she married him. He died December 26, 1911. Robbins bought this land through her father and brother-in-law. Stephen Swade was her father. Thomas H. Robbins conveyed the land to her "in this way: I had a mortgage on a large tract of land, and as there was not enough, quite, to meet my mortgage, I waived part in the mortgage, and Heimick & Allworth deeded me a small interest in the tract—the 2,300-acre tract. It was conveyed to me because I had relinquished a part of the mortgage on the land." She says that her mortgage was on the 12,000 acres for $30,000, and she got $12,500.

A deed is introduced from Marshall Allworth and Frank Heimick to Mary Robbins for the 2,500 acres in controversy, bearing date December 17, 1906, recorded August 7, 1907. It appears that they had, by assignment from Thomas H. Robbins and the Elizabeth City Lumber Company, some interest in a timber contract. These conveyances serve no other purpose than to further confuse the situation. They tend to corroborate Mary Robbins in the statement that she had some financial interest in the property. She was divorced from her first husband. While Mrs. Robbins is not contradicted by any witness in respect to any fact to which she testifies, her testimony, like that of the other witnesses, must be weighed in the light of her interest, and such other tests as either weaken or strengthen it. She appears to be a woman of some 60 years of age and of fair intelligence. She was examined orally before me. There was nothing in her demeanor subject to criticism. Her testimony, in regard to the possession of the deed by Thomas H. Robbins, and the date and manner of its destruction, is not contradicted. The inference which would reasonably be drawn from Thomas H. Robbins' possession is neutralized by the fact that he appears to have retained possession of the deeds relating to this land. None of the originals are produced, tending to sustain the view that he was, at all times, the real and beneficial owner, and that the various grantors and grantees were "dummies."

The burden of proof to sustain the allegation that Thomas H. Robbins forged, or caused the names of plaintiffs Harold and Clara to be forged, to the deed of January 1, 1906, is upon the plaintiffs; they having so alleged in their bill. In regard to Clara C. Cole, the proof of the averment rests upon the accuracy of her memory, with such corroborating circumstances as are disclosed by the evidence. She was in Brooklyn at the date upon which the deed purports to have been signed and acknowledged. As to Harold J. Naylor, there is very strong corroborative evidence that, on January 1, 1906, and February 14, 1906, he was in Ft. Worth, Tex., working with Swift & Co. There is confusion in his own mind, and that of his mother and uncle, as to the dates of his visits to Brooklyn.

The defendants, besides relying on the contention that plaintiffs have failed to carry the burden of proof and establish the truth of their allegation, rely upon the statute of limitation. Without pausing to consider the effect of the statute in force in this state, prescribing the

period of time within which an action must be instituted on account of alleged fraud, the question of laches is presented. This question is pertinent from two viewpoints: (1) In weighing and estimating the value of the evidence introduced by plaintiffs to sustain the charge that the deed was a forgery. (2) Assuming that the weight of the evidence tends to support the allegation, are plaintiffs entitled in a court of equity to the relief prayed for, or should they be remitted to an action at law?

[1] It is open to plaintiffs, in an action at law against Mary Robbins for the recovery of possession of the land, and against the Foreman-Blades Lumber Company for the trespass in going upon the land and removing the timber, to try the issue before a jury. Being out of possession, it is not clear that they are entitled to invoke the equitable jurisdiction of the court by a bill to cancel the deed. United States v. Wilson, 118 U. S. 86, 6 Sup. Ct. 991, 30 L. Ed. 110. Complainants allege that defendant Mary Robbins "claims to be in possession" of the land. She admits that she is in possession. It is not easy to see why, in an action of ejectment, the validity of the deeds may not be tried before the jury. The jurisdiction may be sustained, however, under the provisions of section 1589, Revisal 1905 (N. C.). Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52; New Jersey & N. C. L. & L. Co. v. Gardner-Lacy L. Co., 178 Fed. 778, 102 C. C. A. 220; Id. (C. C.) 190 Fed. 861.

The question presented, at the threshold, is whether the plaintiffs have been guilty of such laches as should bar them from equitable relief. It is not necessary, in dealing with this question, to inquire, except by way of analogy, whether they are barred by the statute in force in North Carolina (Revisal, § 395, subsec. 9), which bars an action after three years "for relief on the ground of fraud or mistake"; the cause of action not being deemed to have accrued until the discovery by the aggrieved party of the facts constituting such fraud or mistake. In an action of ejectment, of course, plaintiffs would not be barred, if the deed was relied on by defendants in their claim of title, from attacking it upon the allegation that it was forged; they would simply say, "non est factum."

[2] When, however, they appeal to the equitable power of the court to cancel the deed as a cloud upon their title, the party claiming under it being in the adverse possession of the land, the effect of the delay upon their right to demand relief is dependent upon other considerations.

"Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them. A court of equity has always refused to aid stale demands, when the party slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence; when these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court." Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718.

"Acquiescence is an important factor in determining equitable rights and remedies in obedience to the maxim, 'He who seeks equity must do equity,' and

that 'he who comes into equity must come with clean hands.' * * * Acquiescence in the wrongful conduct of another, by which one's rights are invaded, may often operate upon the principle of, and in analogy to, estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would be otherwise entitled. This form of quasi estoppel does not cut off the party's title, nor his remedy at law; it simply bars his right to equitable relief and leaves him to his legal actions alone. In order that this effect may be produced, the acquiescence must be with knowledge of the wrongful acts themselves, and of their injurious consequences." Pomeroy, Eq. §§ 816, 817.

This doctrine is illustrated and enforced in numerous cases. A citation of a few, with reference to their analogy to the conditions found in this record, will be appropriate. In Jenkins v. Pye, 12 Pet. 251, 9 L. Ed. 1070, it is said:

"Lapse of time, and the death of the parties to the deed, have always been considered, in a court of chancery, entitled to great weight, and almost controlling circumstances, in cases of this kind."

This was a bill to set aside a deed alleged to have been obtained by undue influence. It was said:

"The general doctrine is established on a very firm footing as the doctrine of this court."

The time elapsing in that case was much longer than here.

"The rule is peculiarly applicable when the difficulty of doing entire justice arises through the death of the principal participants in the transaction complained of, or of the witness or witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible." Fetter's Eq. 43.

Judge Staples, in Harrison v. Gibson, 23 Grat. (Va.) 212, discussing the doctrine, says:

"If, from the delay which has taken place, it is manifest * * * that any conclusion to which the court can arrive must at best be conjectural, and that the original transactions have become so obscured by time and the loss of evidence and the death of parties as to render it difficult to do justice, the court will not relieve the plaintiff. If, under the circumstances of the case, it is too late to ascertain the merits of the controversy, the court will not interfere, whatever may have been the original justice of the claim."

In Lawrence v. Rokes, 61 Me. 38, Barrows, J., says:

"If by the laches and delay of the complainant it has become doubtful whether the other parties can be in a condition to produce the evidence necessary to a fair presentation of the case on their part, or it appears that they have been deprived of any just advantage which they might had if the claim had been put forward before it became stale and antiquated, or if they be subjected to any hardship which might have been avoided by more prompt proceedings, although the full time may not have elapsed which would be required to bar any remedy at law, the court will deal with the remedy in equity as if barred."

Buchanan, J., in Selden's Ex'rs v. Kennedy, 104 Va. 826, 52 S. E. 635, 4 L. R. A. (N. S.) 944, 113 Am. St. Rep. 1076, 7 Ann. Cas. 879, says:

"It has always been a principle of equity to discourage stale demands, and laches is often a defense wholly independent of the statute of limitations. But the rule is adopted because, after great lapse of time, from death of parties,

loss of papers, or death of witnesses, there is danger of doing injustice, and there can be no longer a safe determination of the controversy."

This doctrine, the wisdom of which is vindicated by the experience of the great chancellors of both England and America, has its foundation, not only in a sense of justice to the living, but the peace and welfare of society, and justice to the character and memory of the dead. Chief Justice Fuller in Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134, expresses this truth with elegance and force, saying:

"In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused."

The following language of Judge Merrick is quoted by the Chief Justice, supra:

"Where there has been a change of circumstances with reference to the parties and the property, and still more where death has intervened, so that the mouth of one party is closed, and those who represent his interests are not in a predicament to avail of the explanations which he might have made, out of the charities of the law and in consideration of the fact that fraud is never to be presumed, but must always be proved, and proved clearly, the courts limit very much, in such cases, the measure of time within which they will grant relief, because the presumption comes in aid of the dead man that he has gone to his account with a clear conscience."

In Harwood v. Railroad Co., 17 Wall. 78, 21 L. Ed. 558, a bill was filed five years after the sale of property alleged to have been procured by fraud and collusion. Mr. Justice Hunt said:

"We are also of the opinion * * * that there has been too great delay in initiating this suit, and that no sufficient excuse is given for it. The sale was made five years before the commencement of this suit, and it is fairly to be inferred from the bill that the plaintiffs were aware of the proceedings as they progressed. Their knowledge of the mortgage sale is expressly admitted. The allegation of ignorance is, in general terms, of the fraudulent acts and arrangements. They do not allege when they acquired the knowledge, nor give a satisfactory reason why it was not sooner obtained. For aught that appears, they have slept upon their knowledge for several years. Without reference to any statute of limitations, the courts have adopted the principle that the delay which will defeat a recovery must depend upon the particular circumstances of each case."

In Godden v. Kimmell, 99 U. S. 201, 25 L. Ed. 431, it is said, quoting with approval Mr. Justice Field:

"Where there has been laches * * * or long acquiescence in the assertion of adverse right, he [plaintiff] should set forth in his bill specifically what were the impediments to an earlier prosecution of the claim; and, if he does not, the chancellor may justly refuse to consider his case on his own showing, without inquiring whether there is a demurrer or any formal plea of the statute of limitations contained in the answer."

So, quoting Mr. Justice Swayne, it is said:

"Limitations of the kind are dictated by experience and are founded on a salutary policy, as the lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and the other means of judicial proof."

230 F.—43

In Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 Sup. Ct. 258, 262 (40 L. Ed. 383), Mr. Justice Brown says:

"The question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute proceedings before he did."

In Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738, it is said:

"It is true that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless or have been abandoned; and that, because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them."

It is sometimes held that delay to institute suits charging near relatives with fraudulent conduct is explained by natural and creditable feelings. This would be peculiarly true in a case wherein a man's children and grandchildren are charging him with a gross fraud—a felony. However creditable to them such sentiments may be, they cannot be indulged at the expense of innocent third persons, who have dealt with the property under a reasonable belief, either that the father was not in fact guilty of the crime, or that the children had determined to suffer loss rather than expose him, or that some adjustment of the matter had been made "in the family." In MacKall v. Casilear, 137 U. S. 556, 11 Sup. Ct. 178, 34 L. Ed. 776, this phase of the case is dealt with. There the son was seeking to have, in a suit in equity, a deed canceled upon the allegation that it was procured by the "active, actual, and intense fraud" of his father. The suit was brought five years after the death of the father. To the explanation offered for the delay the Chief Justice said:

"If that laches could in any respect be  *  *  *  excused by reason of his expectations from his father, we cannot allow him to plead that, because these expectations in part failed of realization through some external cause, therefore he is any the less bound, so far as his dead father is concerned, by a delay which would be otherwise fatal. The doctrine of laches is based upon grounds of public policy, which require for the peace of society the discouragement of stale demands.  *  *  *  The time for this son to have attacked his father on the ground of fraud was prior to his father's death; yet no movement was made to set aside these alleged fraudulent conveyances until five years after that event transpired.  *  *  *  Of course, it must be admitted that an affectionate son would feel a natural reluctance to make a charge of fraud against his father; but where the time consumed in overcoming this is prolonged, as in this instance, we cannot recognize the relationship as sufficient explanation of the laches.  *  *  *  The excuse for the delay is that complainant protested against Casilear's claim and notified him that he would not submit to the sale; but the mere assertion of a claim, unaccompanied by any act to give effect to it, cannot avail to keep alive a right which would otherwise be precluded."

This language is strikingly appropriate to the facts disclosed in this record. It would seem that either plaintiffs felt but little interest, or

had but little confidence, in their claim to property which they allege to be of value "of more than $100,000." Neither of the plaintiffs are able to tell who is bearing the expense of the litigation or how it originated. Harold says that his uncle made some terms with counsel "with a contingent." When Mr. Robbins is asked, "Who have you had to advise with you about commencing this suit before you employed counsel?" plaintiffs' counsel said, "I object, I cannot advise him to answer." He said:

"I have taken advice of several." "Then you were to pay the expense of the suit?" "I was not a party." "Have you executed any bonds in the matter?" "No."

Neither of the plaintiffs of record have done so. There is no suggestion, although questions were propounded, inviting explanation why, after waiting five years, during two of which Thomas H. Robbins was alive, and all of which V. Comfort lived in the same city with Mrs. Naylor and her brother, at the particular time this suit was brought, plaintiffs were aroused from their repose and decided to charge in the record their ancestor, in his grave, with the crime of forgery. Even then, no one appears to be willing to assume liability for the cost, and the case is brought into the world of litigation, with no other fatherhood than a contract "with a contingent." It is true that Mr. Robbins says that a definite amount was to be paid, and, "at the option of counsel, a percentage on the amount recovered." There is no purpose to criticize this arrangement, or question its propriety; but a suit in equity of such grave import to the memory of the dead and the property rights of innocent purchasers for value, it would seem, should come into the court with an unquestioned parentage. It should, at least, have a sponsor who was willing to assume liability for the cost.

When parties come into a court of equity, they should not withhold information pertinent to the case, but should bring with them all of the knowledge or information in their power, and produce all of the letters, papers, documents, or other means of enlightening the court which are in their possession, to the end that the very truth may be established. Although, in a number of instances, plaintiffs say that they have, or think they have, letters corroborating their statements, or sustaining their memories, no such letters are produced. These, together with many other circumstances, which it is not practicable to note at length, may of themselves be of slight importance; but when, as in this case, the transaction is enveloped in so much doubt, the charge made is so grave, rendered more so by the relation existing between parties, and the long delay, that every fact and circumstance explanatory of the course pursued by the plaintiffs should have been produced. When the parties in interest are near relatives, and the evidence relied upon is peculiarly and exclusively in their knowledge, and the rights of third parties are involved, courts of equity have always required a frank, full disclosure, and, when possible, supported by corroborative evidence from disinterested persons, or of facts and circumstances. The evidence here is, in many respects, depend-

ent upon the memory of the parties in interest, or closely related to them.

It is difficult to understand why the deed is dated January 1, 1906, purports to have been acknowledged February 14, 1906, and the certificate of the clerk of the Supreme Court, dated February 14, 1907— a year, to the day, thereafter—recorded February 21, 1907. It is possible that, in registering it, a mistake was made as to the date. Mrs. Naylor first thought her son was at home in the spring of 1907. It is difficult to understand why the certification of the official character of V. Comfort was delayed for a year. The other deeds were probated and registered very soon after their date. Of course, this is mere conjecture; but, because of the course pursued by the parties, any conclusion to which we arrive is conjectural. It is in this condition of the evidence, that the delay to act promptly when the allegation, if true, could have been proven to absolute demonstration, that it becomes the duty of the court to scrutinize closely every fact and circumstance which may throw light upon the case. It is because they delayed action until the witnesses are dead, and the original deed destroyed, that the court finds that "there is danger of doing injustice and there can be no longer a safe determination of the controversy," and the "welfare of society demands the rigid enforcement of the rule of diligence."

If the plaintiffs and their counsel, because of natural and creditable feelings, preferred to let the charge rest in the keeping of their household, rather than execute their threat to expose their aged father, and subject him to criminal proceedings, they must be "remitted to the repose from which they should not have been aroused," not alone because "of the charities of the law," but because others have acquired rights which they might have protected if called to their defense promptly. The conduct of the plaintiffs entitles the defendants, especially the Foreman-Blades Lumber Company, to invoke the principle which a great judge said lies at the foundation of all fair dealing between men. If one, whose duty it is to speak, refrains from doing so when the truth may be established, he should, when death, time, and changed conditions have rendered it impossible to do so, keep silent. It is not material whether this rule of conduct is based upon the principle of estoppel, or laches; they are both founded upon the same reason and produce the same result.

There is, however, another well-recognized principle upon which courts of equity refuse to grant relief, where there has been long and unexplained delay. If there was, originally, cause of complaint against the alleged wrongdoer, the delay may be accounted for upon the probability that there has been a settlement, and satisfaction has been made. There is abundant ground upon which a base this presumption here. The threat to initiate proceedings "in a few days" is accompanied with the alternative, unless an adjustment is made, the terms of which are suggested.

Mr. W. A. Robbins, in his letter to the Foreman-Blades Lumber Company, says that negotiations were "pending"; he does not say with whom, or their character. If he had done so in his letter, or in

his evidence, the atmosphere would have been very much clarified. It appears from the letters, and for manifest reasons, that Mr. W. A. Robbins, representing the plaintiffs, desired to have an adjustment of the matter after he learned the existence of the deeds, especially the one to Mrs. Brandeth and the Foreman-Blades Lumber Company.

Mrs. Naylor says that she saw her father "once" after discovering the existence of the deed of January 1, 1906. Mr. Robbins says that he did not see his father "very much" after that. Neither of them are asked whether the charge made by them that the deed was a forgery was mentioned or discussed by them. They were not examined before me, although Mr. Robbins was present at the argument and filed a brief. That it was understood and expected that Thomas H. Robbins should deal with the land, although the legal title was in Mrs. Naylor, as his own, is evident from the terms of the power of attorney executed by her August 31, 1897. He is empowered to "grant, bargain, sell and mortgage all real and personal property, lands, timber, of whatsoever nature, now owned or to be owned by me in the state of North Carolina, or any part of said property, for such price and on such terms as to him shall seem meet," and to make, execute, and deliver deeds, mortgages, etc. It is difficult to conceive of a more comprehensive or inclusive power of attorney. It was not revoked until March 11, 1908.

It is not an unreasonable conclusion to draw from the letters of W. A. Robbins to his father and V. Comfort, and to the Foreman-Blades Lumber Company eight months thereafter, that some settlement or adjustment was made between Thomas H. Robbins and W. A. Robbins, representing Mrs. Naylor and her children. That this was in the mind of Mr Robbins, when he wrote his father and Comfort, is manifest. In his letter to the lumber company he expressly says that some negotiations are pending, and that he is willing to stop them "for a reasonable time to entertain any reasonable proposition" from the company; otherwise, he would "proceed to consummate pending negotiations, if possible, or, failing in this, to take such steps as will be advisable to protect my clients' interest."

In the absence of any explanation of this language, the questions arise: What, and with whom, were negotiations pending, and of what character? Why were no further steps taken? It is reasonable to infer that the negotiations were "pending" between the only parties interested in reaching an adjustment. There is not a scintilla of evidence that any other persons knew of the deeds, or were interested in the property or its ownership. In the absence of any explanation of the language of these letters from the only persons living, or who could give such explanation, the Foreman-Blades Lumber Company are entitled to rely upon all reasonable presumptions which arise upon the record made by plaintiffs and their representatives. It had, on August 8, 1907, paid $10,000 for the standing timber, with the privilege of cutting and removing within five years; their deed was registered four days after its date. There was no secrecy in the transaction. The company began cutting the timber in 1909, and finished in April, 1911. There was neither haste nor delay on its part.

It is suggested that the condition of the public record was sufficient to put the company on notice that Thomas H. Robbins had committed forgery. I am unable to see anything disclosed by the record to suggest that the deed purporting to have been made by plaintiffs to their mother was a forgery. There is nothing on the record to suggest any fraud in the deed from Robbins, attorney for Mrs. Naylor, to Mary Brandeth. This is the first deed found on the record which recites a valuable consideration. There is no suggestion in any of the letters that such a claim was made. On the contrary, Mr. Robbins, in his letter to his father, writes him that:

"All this is without waiving any right or claim on the part of Lillie for an accounting from yourself and the grantee mentioned in the deed, bearing date May 31, 1907, you made and claim to have executed, as attorney for her, in case it is found necessary or desirable thus to collect the same."

There is no suggestion here of a disaffirmance of the deed on the part of Mrs. Naylor; but, on the contrary, her brother and attorney gives notice that she will call upon him for an accounting and payment of the purchase money. It may be that this was the subject-matter of the negotiations pending on December 8, 1908. It is manifest from the language of Mr. Robbins' letter to his father that the latter had assumed "an attitude" in regard to the children's interest in the land in which his son did not "agree at all."

Without further pursuing the discussion, I am of the opinion that the plaintiffs Harold J. Naylor and Clara C. Cole are not entitled to the equitable relief invoked in the bill. The bill, as to them, will be dismissed, without prejudice to the pursuit of such legal rights and remedies, in an action at law, as they may be advised.

As the Foreman-Blades Lumber Company are not asserting any title or claim to the land, or any timber standing and growing thereon, the decree disposes of the case as to them, unless the claim asserted by Mrs. Lillian Naylor can be maintained. While she is joined as party plaintiff, she does not specifically assert any title to the land, insisting that the deed of January 1, 1906 is invalid, for the reason set forth in the bill. She does, however, allege, and it is true that in her deed to her children of May 1, 1898, is found the following language:

"But the said party of the first part reserves the right to enter upon and cut the timber thereon."

It seems, as if to further complicate the title to this land and create further confusion in regard to the ownership thereof, that on September 29, 1900, while the legal title was in her, she, together with her father, Thomas H. Robbins, and his then wife, entered into a contract with the Elizabeth City Lumber Company whereby they sold and conveyed to the company all of the timber on the entire tract of land. Following description of the land is a clause whereby Mrs. Naylor agrees to cut and deliver the timber to the mill of the lumber company, of certain dimensions, with a recital that the company holds a second mortgage on the land for $6,100 and interest, and an agreement to take up a first mortgage held by Terry, and a further agreement that the company will advance to Mrs. Naylor, for meeting the

expense of cutting and delivering the timber, $3 per 1,000 feet. There are a number of other covenants and agreements in the contract not material to any question raised in this case. There is a further provision that, if Mrs. Naylor should fail to cut and deliver the timber, the company should have the right to enter upon and cut the timber upon the terms and conditions set forth. The proceeds of the timber, after discharging the liens thereon, are to be paid to Mrs. Naylor. On April 25, 1902, Mrs. Naylor conveyed the entire tract of land to Lewis Leavens. This deed contains no exception, nor reference to the contract made with the Elizabeth City Lumber Company. On September 1, 1902, Leavens conveyed the land to Thomas H. Robbins.

On November 17, 1903, Robbins conveyed to the Naval Stores Manufacturing Company, in consideration of 498 shares of the capital stock of said company, all of the live and all of the dead timber on said land of the dimensions named therein. On May 25, 1905, Thomas H. Robbins and the Elizabeth City Lumber Company assigned to Frank W. Heimick and Marshall H. Allworth "all their right, title and interest in and to" the contract of September 29, 1900. Robbins, on February 28, 1905, conveyed the entire tract to L. E. Dodge, in consideration of $90,000, "evidenced in part by the assumption of four certain mortgages and in part by cash and other valuable considerations." On March 31, 1905, he executed another deed to Dodge in substitution of the first deed, containing a fuller description, and excepting the land in controversy, conveyed by Mrs. Naylor to her coplaintiffs. On April 15, 1905, the Elizabeth City Lumber Company, in consideration of $40,000 to be paid on May 15, 1905, assigned to Thomas H. Robbins all of its right, title, and interest in and to the contract of September 29, 1900. The payment of this sum was to be in full settlement "of all claims and demands between all the parties, neither holding anything against the other." On April 28, 1905, Dodge conveyed to Heimick and Allworth the entire tract (excepting the land in controversy). On June 13, 1905, Thomas H. Robbins, in consideration of $77,000, executed to Heimick and Allworth a quitclaim deed for all of the land included in sections 63 to 318, inclusive, being the entire tract, excepting the land in controversy.

In the light of the decree dismissing the bill as to plaintiffs Harold J. Naylor and Clara C. Cole, and defendant Lumber Company asserting no title to the land, nor timber standing upon it, there is no question presented as between Mrs. Naylor and the lumber company, of equitable cognizance, unless, as she alleges, there is, by reason of the various contracts and conveyances introduced in respect to the timber, a trust relation entitling her to call on the company for an accounting. This relation, she insists, grows out of the contract made by her and her father with the Elizabeth City Lumber Company, of September 29, 1900, whereby that company became liable to account for and pay over to her the price of the timber cut, after paying and discharging the mortgages and liens thereon. This contention would present a number of more or less interesting questions, some of which are discussed in the brief. It is difficult to thread one's way through this labyrinth of deeds, contracts, etc. It would seem, however, that when

she made the contract with the Elizabeth City Lumber Company, September 29, 1900, she had parted with the legal title to the portion of the land conveyed to her children. She had reserved the right to enter upon and cut the timber thereon. Whether this was a reservation of the timber, and assignable, or whether it was a mere personal privilege to enter upon and cut so much of the timber as she might need for her personal use, are debatable questions. The decision of them is not material here, because when the deed of January 1, 1906, is made to her by her children, which pro hac vice must be treated as valid, she became the owner of the land and timber, and the merger of the two gave her a complete title to both, which passed by the deed executed by Thomas H. Robbins, as her attorney in fact, of May 1, 1907. I am of the opinion that, as said by Mr. Robbins in the letter to his father April 8, 1908, the contract of September 29, 1905, "was a possible logging contract" which had "long since expired."

It was partially, and in very essential respects, executory. It is very doubtful whether any rights in it passed by assignment. The evidence in regard to what was done under it is obscure and uncertain. It is manifest that it would be impossible to deal with it as outstanding in this case. To undertake to treat the defendant Foreman-Blades Company as having cut the timber on the land in controversy under its terms and provisions, from 1909 until April, 1911, would necessitate bringing into the record a number of parties who have, by assignment and otherwise, become interested in, and expended money upon, the entire tract and the timber thereon. It appears that mortgages and judgments securing large debts have been discharged. The bill is not drawn upon any such theory. In paragraph 9, the deeds of January 1, 1906, May 31, 1907, and August 8, 1907, are set forth; and in paragraph 10 it is alleged that, under the said deeds, "the corporation defendant claims adversely to your orator's title, and has no other title to the timber than the alleged deeds set out," etc. The defendant lumber company, denying the charges in regard to the forgery of the deed of January 1, 1906, alleges that it purchased the timber from Thomas H. Robbins and Mary Robbins, and claiming the title thereto under the deed executed by them August 8, 1907, entered upon, cut, and removed the timber prior to the beginning of this suit. It is manifest that neither plaintiffs nor defendants were relying upon or making any reference in their pleadings to the contract of September 29, 1900, or any of the various deeds and assignments relating to it.

Eliminating this phase of the case, the pleadings and evidence, upon plaintiffs' own showing, disclose no controversy between Mrs. Naylor and the Foreman-Blades Lumber Company, cognizable in a court of equity. If, as contended by plaintiff, the deed from Harold J. Naylor and Clara C. Cole to her is a forgery, the sole interest which she had in the timber was based upon the reservation in her deed to them. If, on the contrary, the deed to her is valid, she was the owner of the land and timber, and remained so until Thomas H. Robbins, as her attorney, conveyed it to Mary Brandeth. If, as she contends, this deed was void, either because, by reason of the several deeds executed by her, the power of attorney was revoked, or because it was fraudulent

in fact, and she continued to be the owner of the land and timber, the entry by the lumber company during the year 1909, and cutting the timber therefrom, was a trespass for which she has a full and adequate remedy at law. There is, in no aspect of the case, any trust relation. The measure of damages for the alleged trespass is well settled, and the ascertainment of the amount peculiarly a question for a jury.

Counsel for defendants urge with force the contention that Mrs. Naylor, having conveyed the entire tract to Leavens by her deed of April 25, 1902, is estopped to claim title as against him, or those claiming under him; hence, if by the deed of Harold J. and Clara C. of January 1, 1906, the land in controversy was conveyed to her, she cannot set up the title thus acquired against those claiming under Leavens, who conveyed to Thos. H. Robbins by deed dated September 1, 1902, so that whatever title Mrs. Naylor had at the time she conveyed to Leavens, or acquired thereafter, vested by estoppel in him, and by his deed Robbins acquired a perfect title which he conveyed, as to the standing timber, to the Foreman-Blades Lumber Company. Hallyburton v. Slagle, 132 N. C. 957, 44 S. E. 659.

It is doubtful whether the questions raised by Mrs. Naylor and discussed by her counsel are presented upon the pleadings, or could be properly joined with the cause of action set out by her coplaintiffs— whether, if set out, the bill would not be subject to demurrer because multifarious. As the entire evidence was before the court, and to bring this unfortunate controversy to an end, so far as the questions presented are cognizable in a court of equity, or at least enable the court of last resort to do so, I have deemed it proper to dispose of all of the phases presented.

A decree will be drawn dismissing the bill without prejudice to the plaintiffs pursuing such course in actions at law as they may be advised. The defendants will recover their cost.