RICHMOND CEDAR WORKS v. PITTSBURG LAND & LUMBER CO. et al.

(District Court, E. D. North Carolina. December 11, 1916.)

No. 342.

1. ADVERSE POSSESSION ⬯79(4)—EXCLUSIVE CHARACTER—COLOR OF TITLE— TAX DEED.

By the laws of North Carolina in force in 1801, a nonresident owner of a tract of land lying in two or more counties was permitted to list the entire tract for taxation in either county. In that year such a tract was sold for taxes by the sheriff of one of the counties in which it lay, was conveyed to the Governor of the state, and the title conveyed became vested by operation of law in the Board of the Literary Fund, which held it for the benefit of the public schools. The board subsequently took possession of the land, and from 1837 to 1847 exercised acts of ownership by warning off trespassers, laying out roads, constructing drainage canals, and selling portions of the tract. *Held* that, whether or not the sheriff had legal authority to sell that portion of the tract which lay outside of his own county, his deed constituted color of title, and when followed by entry and adverse possession for more than seven years vested the board with perfect title as against grantees of one who then claimed to be the owner and whose claim was denied by the board.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 462; Dec. Dig. ⬯79(4).]

2. QUIETING TITLE ⬯10(2)—PERSONS ENTITLED TO RELIEF—STATE AND SPECULATIVE CLAIMS.

In 1795 the state of North Carolina made a grant of a tract of land containing 194,840 acres, the boundaries of which were described. During 100 years thereafter, neither the grantee nor any of his successors in interest paid any taxes on the land, and in 1801 it was sold for taxes, and the title thus conveyed passed to the state for the benefit of its school fund. From 1837 to 1847 the board having charge of such property was in actual possession, making improvements and claiming exclusive title, which claim the board and its grantees have ever since asserted, and have been in actual possession of portions of the tract. About 1840 a claim of ownership was made by one claiming under the original grantee, which was denied by the state, and no further claim adverse to the state was asserted until 1906, when one claiming under the original grant conveyed her interest for $250, and her grantee conveyed the portion in suit, valued at $8,000, to the complainant for a consideration of $75. Complainant went upon the land, built a small cabin, and employed a man to reside therein, and brought the present suit to quiet its title. *Held* that, aside from the question of title, complainants' claim was stale, and its interest speculative, and that it was not entitled to relief in a court of equity.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 37, 40, 42; Dec. Dig. ⬯10(2).]

In Equity. Suit by the Richmond Cedar Works against the Pittsburg Land & Lumber Company and others. Decree for defendants.

Winston & Biggs, of Raleigh, N. C., and W. W. Starke, of Norfolk, Va., for plaintiff.

E. F. Aydlett, of Elizabeth City, N. C., and Mark Majette, of Columbia, N. C., for defendants.

CONNOR, District Judge. [1] Plaintiff alleges that it is the owner and in possession of a tract of land, situate in Tyrrell county, N. C., a particular description whereof is set out in the bill; that defendants hold a deed covering the land, and claim to be the owners thereof. The prayer is for a decree adjudging that defendants' claim is invalid, and for other and further relief. Defendants deny that plaintiff is the owner of the land, admit that they have a deed therefor, and aver that, by virtue of said deed, they have a good and valid title to the land and are the owners thereof. The jurisdictional averments are admitted.

The land in controversy is a portion of a large body of swamp land, covered by grant No. 317, issued by the state of North Carolina, January 2, 1795, to John Hall for "one hundred and ninety-four thousand, eight hundred and forty acres of land in our county of Hyde," etc. This language is followed by a specific description calling for corners and lines of older grants and natural objects—rivers, lakes, etc. It appears that, while that portion of the land claimed by plaintiff is within the boundaries called for by the grant, it is situate in Tyrrell county, which county was established prior to January 2, 1795.

On September 21, 1800, John Hall, residing at Philadelphia, Pa., executed his last will and testament, which was upon his death, January 30, 1801, admitted to probate by the court of that city, having jurisdiction to take probate of wills, and duly recorded in the office in said city, as provided by the statute of Pennsylvania. The will was not then admitted to probate in North Carolina. On November 20, 1906, upon the affidavit of A. D. Ward, Esq., attorney for the University of North Carolina, a certified copy of the will was admitted to probate by the clerk of the superior court of Tyrrell county and recorded in the registry of wills of said county. John Hall devised to his son, Baynard Hall, "one moiety of a tract of land in North Carolina, containing 22,400 acres," and to John Wyatt "the other moiety of the 22,400 acres of land in North Carolina." He directed that:

"The remainder of my lands and all my debts be appropriated in discharging my debts and, after this is done, I wish the residue to be equally divided between Baynard Hall, John Wyatt and Harriett Hankins."

The will contains no other reference to land in this state. The evidence tends to show that Baynard Hall was, at the date of his father's death, an infant of tender years. Baynard Hall married Mary A. Hall, and upon his death such estate and title as he had in the lands vested in his wife, Mary A. Hall, who executed a last will and testament October 13, 1864. She devised to her sister, Martha M. Young:

"My house and lot situated at 252 Cumberland street, Brooklyn, Long Island," her personal estate, and "all my right, title and interest being a one-third interest in the house and lot known as 202 North Fifth street, in the city of Philadelphia and state of Pennsylvania."

There is no reference to any land in North Carolina, nor is there any residuary clause disposing of land. The will contains a residuary clause giving to her sister, Martha M. Young, "all the personal effects and estate whatsoever of which I may die seized."

Martha M. Young executed her last will and testament, October 21, 1865, devising to Sarah M. F. Scott "all my property, real and personal, of which I am now possessed, or shall be seized at the period of my death." This will was duly admitted to probate in the Surrogate's Court, Kings county, N. Y., January 8, 1867. A copy of the will of Mary A. Hall and Martha M. Young were certified and ordered to be recorded in the book of wills of Hyde county, N. C., October 15, 1906. Sarah M. F. Scott married Hadden, and on April 2, 1906, in consideration of $250 conveyed to H. T. Greenleaf:

"All of her right, title, and interest in and to a certain tract of land, situated in the state of North Carolina and in the counties of Hyde and Beaufort, patented by the state of North Carolina to John Hall and numbered 317, and dated January 2, 1875."

The only other description contained in this deed is by reference to the record in the Secretary of State's office and the office of the register of deeds of Hyde county, N. C., Book 1, page 428, and also in Grant Book, page 351, and—

"the said lands descended from John Hall, the ancestor of Baynard R. Hall, and was thereafter inherited by one Mary Ann Hall, who devised by will to one Martha M. Young, who devised to Sarah M. F. Hadden, formerly Sarah M. F. Scott; said Martha M. Young being the sister and only devisee and heir at law of said Mary Ann Hall."

This deed was recorded in Tyrrell county August 17, 1908.

On January 9, 1906, H. T. Greenleaf, in consideration of the sum of $75, conveyed to the Richmond Cedar Works "that portion of the John Hall patent, No. 317, dated January 2, 1795, containing 195,840 acres." Following this language is a specific description of the land described in plaintiff's bill. This deed was recorded in Tyrrell county February 21, 1908. It does not appear that John Hall, or any person claiming under him, through whom plaintiff claims, was ever in possession of any portion of the land in controversy. A short time before this suit was instituted, and for the purpose of instituting the suit, the plaintiff's employés built a small cabin, 8 by 10 feet, on the land and employed a man to reside therein.

Passing, for the present, several questions presented upon the plaintiff's paper title, for the purpose of considering the defendants' title, it may be conceded that the deeds, wills, etc., introduced, show a connected chain of title from John Hall to plaintiff, unless there is a break in the chain prior to the date of plaintiff's deed.

Defendant, for the purpose of taking title out of Baynard R. Hall, introduced a certified copy of a deed, executed by said Baynard and his wife, bearing date October 21, 1841, conveying to John Vaughan, Robert Porter, James Dandas, and Benjamin Rugler all of his right, title, and interest in the lands granted by the state of North Carolina to John Hall, by grant No. 317, bearing date January 2, 1795, and to lands covered by several other grants. A specific description of grant

No. 317, in the words in the grant, is given in the deed.  The land is conveyed to the grantees in trust for the use and benefit of the North Carolina Land Company, a corporation formed under the laws of the state of Pennsylvania.  This deed was recorded in Hyde county January 11, 1848, and in Tyrrell county April 29, 1915.

It appears that on February 20, 1801, James Watson, sheriff of Hyde county, sold the lands covered by the John Hall patent 317 for taxes to Edward Harriss, who conveyed to William Orr March 7, 1801, who conveyed to the state (Governor).  William Orr also devised the land to W. A. Blount, who conveyed to the Literary Fund November 28, 1840.  Certified copies of the proceedings of the Board of the Literary Fund of North Carolina show that, during the years 1837 to 1847, the board, acting under and pursuant to acts of the General Assembly, was engaged in surveying, draining, and reclaiming the lands covered by the John Hall grant.  Canals were cut, roads laid out, trespassers warned off, sales made, and other acts of ownership exercised over and in regard to these lands.  In the report of the engineer, who was in charge of the survey of the lands, specific reference is made to the "Hall patent," to which the board was claiming title.  While it is not practicable to refer to all of the acts of the board, reference to a few will indicate the character and extent of the claim and assertion of ownership:

On March 17, 1838, a resolution was adopted referring to a tract of some 56,000 acres lying on the east of Pungo river, sold by James Watson, sheriff, as the property of William Orr, and conveyed to Benjamin Williams, Governor, September 1, 1801, as being the property of the state and capable of being reclaimed, and "from the facilities which it offers for draining demands the first attention of the board, the same is hereby selected for their first operations."  The engineer is directed "to make particular survey of this tract and lay out the route for such canals as he may deem proper and essential."  A large sum of money was appropriated for, and spent, in draining and reclaiming these lands.  It appears from the record of proceedings of the board that Mr. Hawkes, attorney for the American Land Company, "set up" title to a portion of the lands drained and claimed by the Literary Board.  They claimed title through the heirs of "one Hall" and offered to negotiate with the board, which offer was declined.  On December 4, 1841, the board entered into a contract with A. C. Dickinson for "executing tributaries to Alligator Canal," for protecting the lands of the board from intruders and testing its productiveness by experiments.  The contract is set forth in the minutes of the board.  Payments were made Dickinson for "getting out stumps in front of the canal, for building three bridges," etc.  In a report made by the board to the General Assembly, December 4, 1846, among much other interesting information, I find the following, indicating the extent of the activities of the board in regard to these lands:

"The board regret that accidental circumstances prevented them from visiting the swamp lands belonging to the school fund, which have heretofore been drained in the autumn of last year.  A member of the board residing in the town of Washington is their agent to overlook these lands, and receive proposals to purchase any part thereof.  No sale has, as yet, been effected, but

good policy seems to require that some portions of the drained lands shall be disposed of to promote culture and settlement in that region. * * * Since the adjournment of the last Legislature, an agent of certain persons in Pennsylvania, styling themselves the North American Land Company, have submitted to the board claims of title to a large portion of these lands. The board were not satisfied with the validity of these titles, and could, in no manner, recognize them, the more especially as it was manifest that the claimants had full knowledge of the state's operation in draining these lands while they were in progress and contributed nothing thereto."

The board further say that since the commencement of the session of the Legislature—

"information has been received that two individuals have entered on these drained lands and are now pretending to be occupants thereof. The board will take prompt measures to have them removed or punished."

On April 1, 1847, Governor Graham, president of the board, directed a letter to the sheriff of Hyde county, in accordance with the act of the General Assembly, requiring him to give notice to trespassers to get off these lands, etc. On May 15, 1847, the members of the board went to the lands to attend a sale of portions which had been advertised, and, upon claim being made by Mr. Whitehead for some land company, determined to warrant and defend the state's title. The relevancy of this evidence of possession of these lands by the Board of the Literary Fund is found in the fact that, by various acts of the General Assembly, in accordance with the educational policy of the state, the title to the swamp lands was vested in the board and dedicated to the purpose of educating the children of the state. The evidence consists of certified copies of the proceedings of the board and is to be found in the very valuable work of Chas. L. Coon, Esq., "Public Education in North Carolina—Documentary History—2 Vol. —Publication N. C. Historical Commission." Its import is found in the contention that the portion of the John Hall patent, No. 317, in controversy, is situate in Tyrrell county, whereas James Watson, sheriff of Hyde county, sold the entire tract.

The explanation of this is found in the act of the General Assembly, which permitted a person, who did not reside in the state, but owned a tract of land lying in two or more counties, to list the entire tract in either county. 1 Martin's Compilation, 205. The statute did not specifically authorize the sheriff of the county in which the land was listed for taxation to sell any portion of the tract lying in other counties. It appears, from evidence in this and other cases which have come before me, that sheriffs construed the statute as authorizing a sale for taxes of the entire tract, as was done in the instant case. In the last years of the eighteenth century the record discovers that very large tracts of land in the eastern and western sections of the state were patented by persons, many of whom resided in other states. The boundaries of these lands were indefinite, as were the boundaries of many of the counties. The grantees did not take possession of their large holdings, and frequently failed to pay taxes on them. The Supreme Court Reports and legislative records throw an interesting light upon the effect which this condition created upon the title to our swamp and mountain lands. It was the evident purpose of the Legis-

lature to enable these nonresident grantees to list their lands, which overlapped county lines, in either county.

It is doubtful whether the act extended to sheriffs power to sell, for nonpayment of taxes, any other portion of such tracts than that lying in their counties. However this may be, I think it clear that the deed of the sheriff conveying the entire tract, including portions thereof, situate in Tyrrell county, was color of title, and when followed by entry and adverse possession of the board entering and claiming under such deed, continuing for seven years, ripens into a perfect title. In addition to the public records cited, the oral evidence taken in this case shows that the canals or "tributaries," as they are called, are now on the land. (See evidence of Mr. Makely and J. H. Wahab.) The evidence shows that, for more than seven years, the board was in possession, exercising acts of ownership—dominion over these lands. The character of this possession was manifestly adverse to all persons and especially to the American Land Company claiming under Baynard R. Hall.

So far as appears from the evidence, the representative of this company abandoned any further claim to the land. Between 1848 and 1870, four years of war and five years of disorganization of the educational work of the state, no action seems to have been taken by the board or its successor, the State Board of Education in regard to the swamp lands. It appears that, at the session of 1870 (Rev. St. N. C. 1873, c. 68, § 25), the General Assembly passed a statute authorizing the Board of Education to make sale of the lands owned and held by the board lying in the counties of Hyde, Tyrrell, and Washington for the sum of $50,000. Pursuant to the act, the board entered into a contract with Samuel T. Carrow and D. P. Bible for the sale of the entire body of swamp lands in the counties named in the statute for the sum authorized. A portion of the purchase price was paid and note executed for the balance. There is evidence that a number of persons settled upon portions of the lands—but none on the part in controversy—under Carrow and Bible. They remained there many years, built houses, and lived in them—some as long as ten years.

Carrow and Bible having failed to pay the balance of the purchase price the State Board of Education, on October 20, 1883, instituted an action in the superior court of Hyde county against them for the purpose of subjecting the lands to sale for the payment of the balance due on the notes. At the fall term, 1884, a decree was passed directing a sale of the land, appointing L. C. Latham commissioner to make the sale. At the fall term, 1886, the commissioner reported that he had sold the lands in accordance with the terms of the decree, and that the State Board of Education had bought them for the sum of $35,000. The sale was at the same term confirmed, and the commissioner directed to make title to the Board of Education. This was done, and the board thereafter conveyed to the Real Estate Investment Company, and this company, on April 12, 1902, conveyed to James and William Sprunt. The evidence tends to show that the Sprunts sent a man by the name of Russell to the lands purchased by them; that he built a house, stables, etc. on a portion of the land, not

the part in controversy. He built wire fences around several hundred acres and put a large number of cattle to "run" upon it—one witness says so many as a thousand head. It does not very clearly appear that the fences were around the part of the land in controversy, but it does appear that this land was covered by the deeds as a part of the large boundary. The land was low, wet, with but little timber on it. Within two or three years the cattle died, the experiment being a failure, and the fences remained until the posts rotted. (See testimony of Wahab and Makely.) Sprunt conveyed to Makely, Makely conveyed to Tarrault L. & L. Company, and that company on May 3, 1909, conveyed to defendant. The land in controversy was not cut off or described as separate from the patent until Greenleaf conveyed to Richmond Cedar Works, January 9, 1908. A plat is attached to his deed.

Assuming, therefore, that John Hall's title vested in his son Baynard, although this is doubtful, under the terms of his will, it would seem that Baynard parted with such title as he had by his deed to trustees for the American Land Company in 1841. If, however, this is not so, it is doubtful whether, under the wills in evidence, such title as Baynard had vested in Sarah M. F. Hadden, who undertook to convey to Greenleaf. If, passing these difficulties, it is found that plaintiff has the paper title, it is manifest that, beginning with the deed of Watson, sheriff, which was, in any aspect, color of title, followed up by the entry and unequivocal assertion of title by the Board of the Literary Fund, in which, by legislative enactment and the deeds in evidence, the title to these lands vested, and the subsequent acts of its successor, the State Board of Education, I am of the opinion that such title as plaintiff's grantor may have had was divested. The possession of the board and its grantees of the entire tract, claiming under deeds covering it, of course, extended to the boundaries called for by the deeds and included the land in controversy.

[2] Whatever may be the legal status of the title, it would seem that plaintiff's position in a court of equity does not appeal to the court. It savors of being "stale" and speculative. The representatives of John Hall paid no taxes, asserted no title, except by the deed of Baynard, 1841, for quite 100 years. With a singularly attenuated claim in 1906, Mrs. Hadden conveys to Greenleaf for $250 a tract of land containing 195,840 acres, worth many thousand dollars. Greenleaf, in consideration of $75, conveys a portion of the tract, valued at $8,000, to plaintiff; not a dollar of taxes has, so far as appears, been paid to the state by these claimants. During this time the state's representatives have, by all possible means, endeavored to make the only use of this land of which it was capable, for the purpose of promoting the education of her children. While the plaintiff brought its bill soon after getting a deed, its grantee, and those under whom she claimed, have, for more than 50 years, during a large part of which period the Board of the Literary Fund and its successors were constantly, and in many ways, publicly proclaiming and asserting ownership of the land, slept upon their supposed rights, and failed to list the land, or pay tax thereon. Equity responds to the call of the vigilant— the diligent—those who have, in good faith, asserted their rights and

taken the burdens which such rights impose. The plaintiff can scarcely be termed a purchaser for value, and is clearly not a purchaser without notice; it knew when it purchased that it was buying a doubtful, disputed title. Equity will not encourage speculation in such titles, but leave those who indulge in the purchase of them to the courts of law. Naylor v. Foreman Blades Co. (D. C.) 230 Fed. 658.

The bill will be dismissed, and the cost taxed against plaintiff. A decree may be drawn accordingly.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes