GUENTHER v. DENNIS–SIMMONS LUMBER CO.

(District Court, E. D. North Carolina. September 17, 1917.)

1. ADVERSE POSSESSION ⬦⮞58—NATURE AND REQUISITES—HOSTILE CHARACTER OF POSSESSION—"OUSTER."

To constitute an ouster upon which a title based on adverse possession can be sustained, the entry must be hostile in its inception, or, if originally acquired and held in subordination to the title of the true owner, there must be a disclaimer, either by words or acts, of the right derived from the true owner and an actual hostile possession asserted of which he has notice, or which is so open and notorious as to raise a presumption of notice.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ouster.]

2. ADVERSE POSSESSION ⬦⮞85(3)—NATURE OF REQUISITES—HOSTILE CHARACTER OF POSSESSION.

In 1853 the owner of a tract of land purchased from the grantor of the state sold and conveyed it to M., reserving the right to cut timber thereon. Afterward he conveyed the same land, with other property, in trust for his creditors, and the trustees sold it to grantees, who were chargeable with actual notice of the deed to M. They afterward obtained a conveyance of this and other lands based on a prior grant, which was later adjudged void and canceled for fraud at suit of the state. At a sale in a partition suit one of such grantees acquired the interests of all the others, and in 1902 his executors sold the land in suit at public auction to defendant corporation, which had no notice of the deed to M. made in 1853, which was probated and registered on the same day defendant's deed was executed. Defendant went into possession, paid taxes on the land thereafter, and cut timber thereon. Its predecessors had also cut timber thereon for many years. Complainant claims through a deed from the administratrix of M. *Held*, that the cutting of timber by defendant's predecessors in title must be considered as having been done under the reservation in the deed to M. and in subordination thereto, but that defendant's possession which was open and notorious was hostile and adverse and operated as a disseisin of the true owner, and that under the North Carolina statute an action to recover the land from defendant was barred in 7 years from the time it took possession.

3. PUBLIC LANDS ⬦⮞164—STATE LANDS OF NORTH CAROLINA—EFFECT OF DECREE CANCELING INVALID GRANT.

An act of the North Carolina Legislature in 1836 (Laws 1836–37, c. 23) created a corporate body, to be known as the "President and Directors of the Literary Fund of North Carolina," and provided that all the swamp land of the state "not heretofore duly entered and granted to individuals" should be vested in said corporation in trust, to be sold for the benefit of the common schools. A grant previously made was afterward held void and canceled for fraud on information filed by the Attorney General.

---

⬦⮞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Held,* · that the decree did · not vest the President, etc., of the Literary Fund with a new title to the · land, but that its effect was to adjudge that the land had not been "duly entered and granted," and to remove the cloud upon the title created by the invalid grant, and that it inured to the benefit of the ·grantors in a grant made in the meantime by the Literary Board.

4. ACKNOWLEDGMENT ⬯53—PROOF OF ANCIENT DEEDS—NORTH CAROLINA STATUTE.

The probate in 1902 of a deed executed in 1853 *held* valid under Revisal N. C. 1905, § 997, which was then in force.

5. DEEDS ⬯194(5)—DELIVERY—PRESUMPTION FROM PROBATE AND REGISTRATION.

The probate and registration of a deed furnishes presumptive proof of its delivery.

6. ADVERSE POSSESSION ⬯112—BURDEN OF PROOF—PRESUMPTION.

One who alleges that he is in the adverse possession of land is required to prove it; the presumption being that he holds in subordination to the true title.

7. ADVERSE POSSESSION ⬯71(3)—NATURE OF REQUISITES—INTENT—"OUSTER."

Where the legal title to land was in one person and to the timber thereon in another, and the latter undertook to convey the land, including the timber, while his deed was ineffective to convey the land, its registration and the taking possession by his grantee was an ouster of the true owner, and its continued possession and paying taxes on the land are proof of an assertion of title adverse to the true owner.

8. QUIETING TITLE ⬯29—RIGHT TO RELIEF—LACHES.

A suit in equity to quiet title to swamp land valuable only for its timber *held* barred by laches, where defendant, on receiving and registering a deed to the land, at once took open possession, listed the land for taxes, and continued to cut timber thereon for a period longer than required to give it title by prescription under the state statute of limitations, and where complainant claims under a deed which was withheld from registration for 50 years, during which time adverse claims were asserted which must have been known to the parties in interest under such deed.

In Equity. Suit by Emil Guenther against the Dennis-Simmons Lumber Company. Decree for complainant in part and for defendant in part.

Small, McLean, Bragaw & Rodman, of Washington, N. C., for· plaintiff.

Ward & Grimes, of Washington, N. C., and Harry W. Stubbs and Wheeler Martin, both of Williamston, N. C., for defendant.

CONNOR, District Judge. Plaintiff claims title to a large body of timber lands lying in Martin county and surrounded by Roanoke river, and a creek called Devil's Gut. The island formed, in this way, is known and referred to in deeds and grants as "Devil's Gut Swamp or Pocosin." It is low, swampy land, incapable of drainage and chiefly valuable for the timber trees growing upon it. The controversy embraces several tracts. It will be convenient to follow the course pursued by counsel in their briefs, dealing with the tracts separately.

### Tract No. 1.

· This tract, as located by the surveyor, contains 1,713 acres. Both parties claim under a common source of title and introduce: A deed

bearing date September 23, 1852, from the Literary Board of North Carolina to John B. Beasley, duly recorded. John B. Beasley to S. S. Simmons, bearing date September 16, 1853, duly recorded. S. S. Simmons to Clayton Moore, bearing date December 20, 1853. Following the habendum, this deed contains the following:

"Saving and reserving to him, the said S. S. Simmons, his heirs and assigns, all the timber upon the said lands and the privilege of working up the said timber into shingles, or cutting canals and building houses for the convenience of his, or their, hands in getting shingles upon said lands."

It also conveys:

"All the land that said Simmons owns upon Cut Cypress Island, lying opposite Bald Gray, and a tract of 1,280 acres in Bertie county."

The deed also contains a covenant that S. S. Simmons will pay "the increase taxes that the land are now subject for, and what they may be subject for while said S. S. Simmons is working said timber." It was admitted to probate and registered November 3, 1902. The consideration set out is $178.

Plaintiff claims under a deed of Hattie A. Thigpen, administratrix of Clayton Moore. For the purpose of showing title out of Clayton Moore, defendant introduced a deed of trust executed by S. S. Simmons to H. G. Spruill, C. L. Pettigrew, and Chas. Latham, bearing date February 21, 1856. This deed conveys to the trustee, for the purpose of bringing to sale, for the payment of the debts of the grantor, a very large number of tracts of land, in several counties, many slaves, and a large quantity of personal property. The descriptive words in this deed are:

"Also the following tracts of land in Martin county: A tract of cypress swamp land, containing six hundred acres, more or less, purchased from John B. Beasley, Spruill and Morse, Wilson Walker, Jackson Walker, Clayton Moore, H. G. Spruill, C. L. and W. F. Moore, trustees of J. H. Bennett and Winthrop and Armistead the tract lying between Devil's Gut and Roanoke river."

In view of the fact that Spruill, less than 3 years prior to the execution of the deed, had conveyed the land purchased from John B. Beasley to Clayton Moore, reserving the timber, it is unreasonable to suppose that he intended to do more than convey the standing timber, with the right to cut and remove it. In view of the fact, shown by the evidence and manifested by the deed, that S. S. Spruill was engaged, on a very extensive scale, in getting timber and making shingles from many large bodies of swamp lands in Eastern North Carolina, and the further fact, as indicated by the terms of the deed, that he was insolvent and intended to retire from business, it is not probable that he intended to reserve the timber on lot No. 1 from the deed of trust.

Looking at the deed from its "four corners," and the facts disclosed in the evidence, I am of the opinion that the descriptive words of the deed include lot No. 1, vesting in the trustee such right, title and interest as S. S. Simmons had therein. Spruill, Pettigrew, and Latham,

trustees, by virtue of the powers contained in the deed of trust, on December 30, 1856, conveyed the lands conveyed to them, by the same description contained in the deed of trust to W. H. Davis, Dennis Simmons, D. D. Simmons & Bro. and C. W. Grandy, except that the deed from Spruill to them calls for "six hundred acres" in Martin county, whereas their deed calls for "6,000 acres." After describing the lands, as they are described in the deed to them, their deed contains the following clause:

"Together with all the right, title and interest of the said swamp land or timber, lying on the Roanoke river, or any of its tributaries."

The chain of title, under which defendant claims, will be set forth later.

Defendant insists that the court should find, as a fact, from the evidence, that the grantees of the trustees of S. S. Simmons, from and after the execution of the deed to them, December 30, 1856, have been in the adverse possession of the land for 7 years, and thereby acquired title, as against Clayton Moore, who died in 1881, and that plaintiff acquired no title by the deed of Hattie A. Thigpen, administratrix. Plaintiff resists this claim, insisting that cutting and removing timber from the land by S. S. Simmons, and his assigns, being in accord with their reserved right to do so, did not constitute possession or, if it did so, such possession was not adverse to Clayton Moore and those claiming under him.

[1] The evidence tends to show that S. S. Simmons cut timber on the land, subsequent to the execution of the deed from him to Moore, and prior to the deed of trust to Spruill, Pettigrew and Latham. Such cutting of timber did not constitute possession—it was the exercise of the right reserved in his deed. To constitute an ouster, upon which a title, based upon adverse possession, can be sustained, the entry must be hostile in its inception, or, if originally held and acquired in subordination to the title of the true owner, there must be, to change the character of the possession and make it adverse, a disclaimer, either by words or acts, of the right derived from the true owner, under which the possession was acquired, and an actual hostile possession asserted, of which he has notice, or which is so open and notorious as to raise the presumption of notice. 1 Am. & Eng. Enc. 798. This statement of the law is sustained by numerous illustrative cases in the North Carolina Reports. Nance v. Rourk, 161 N. C. 646, 77 S. E. 757, where the authorities are reviewed and the reason of the law stated. Mr. Justice Walker says:

"It is a well-settled rule of the law that, when one acquires possession of land by contract or agreement with another and in subordination to his title, he cannot ordinarily dispute that title, until he has surrendered the possession so acquired and placed the one with whom he has thus dealt at arm's length with himself." Quoting Judge Ruffin, in Yarborough v. Harris, 14 N. C. 40: " 'The rule is founded on high grounds of morality and good faith, and at all times ought to be rigidly adhered to, where circumstances require its application.' " And, as said by Judge Dillard in Farmer v. Pickens, 83 N. C. 549: " 'The rule is founded on a principle of honesty, which does not allow

possession to be retained in violation of that faith (and confidence) on which it was obtained or continued.' "

The refusal of the courts to permit one who enters into possession, under a contract of lease, or contract to sell and convey, or license, to deny the title of the owner is based upon the principle of estoppel; hence it is frequently said that a tenant is estopped to deny his landlord's title, and it is held that, before he will be permitted to assert a claim, based upon an adverse possession, he must surrender the possession. In Willison v. Watkins, 3 Pet. 43, 7 L. Ed. 596, Mr. Justice Baldwin says:

"It is an undoubted principle of law, fully recognized by this court, that a tenant cannot dispute the title of his landlord, either by setting up a title in himself, or a third person, during the existence of the lease or tenancy. The principle of estoppel applies to the relation between them, and operates in its full force to prevent the tenant from violating that contract by which he obtains and holds possession. * * * He cannot change the character of the tenure, by his own act merely, so as to enable himself to hold against his landlord, who reposes under the security of the tenancy, believing the possession of the tenant to be his own, held under his title, and ready to be surrendered on its termination, by the lapse of time, or demand of possession. The same principles apply to mortgagor and mortgagee, trustee and cestui que trust, and, generally, to all cases where one man obtains possession of real estate belonging to another, by a recognition of his title."

[2] If the purchaser of the timber could, during the period given for cutting, by any act on his part, not brought home to the owner of the land, change the character of his entry, and qualified possession, under the contract, into a disseisin and adverse possession, thereby divesting the owner of his title, unexpected and unjust results would follow. The reason upon which the rule is based applies with full force between the owner of the land and one cutting and removing timber therefrom, under a sale, or reservation, with license to do so. Unless, therefore, there be found some fact in the record, taking the case out of the general rule, it must be held that S. S. Simmons and his grantees, with notice of the deed, will be presumed to have cut and removed the timber under the reservation and in recognition of Moore's title. The evidence shows, and the fact is, that after the execution of the deed by S. S. Simmons, and the sale by his trustees, the purchasers and their assigns, with some interruptions, caused by the Civil War, and the condition of the markets, continued to cut and remove the timber from tract No. 1.

Defendant insists that the deed from S. S. Simmons to Clayton Moore, not being registered, conveyed only an inchoate title, and that his trustees took the legal title without notice; that the purchasers from the trustees took, without notice and entered upon and cut timber from the land, under and by virtue of the deed from the trustees to them. It is in evidence, without contradiction, that Dennis Simmons resided in Martin county, and was, at the time of the execution of the deed, the agent and representative of S. S. Simmons, in cutting timber on the land prior to and at the time he executed the deed of trust. Lawrence James says that Dennis Simmons was S. S. Simmons' "over-

head man, or superintendent in the operation there. * * * Dennis Simmons was in charge for Mr. Sam Simmons. * * * He succeeded to the work he was carrying on in the swamp. * * * Mr. Sam Simmons worked clean up to the time he failed." Upon redirect examination, this witness, 84 years old, said that Dennis Simmons, after the sale, "carried on the work for himself, just like he had carried it on before as the superintendent of Samuel Simmons." He was Samuel Simmons' nephew. I should not hesitate to find that Dennis Simmons had knowledge of the execution of the deed to Clayton Moore, and that Samuel Simmons was thereafter cutting timber under the reservation. This fact is of importance at this time on the question of, and explaining the conduct of, Dennis Simmons, and his associates, after the purchase from the trustees of S. S. Simmons.

Defendant insists that, on September 29, 1859, Dennis Simmons and his associates acquired a new, independent, and superior title to the land. This contention is based upon the following facts:

On April 2, 1853, the Attorney General of the state instituted an information against Clayton Moore and others, for the purpose of having a grant issued by the state to one Samuel Smithwick, on November 14, 1800, No. 465, vacated. From the record it appears that, on several dates prior to the date of the grant, Samuel Smithwick, and other persons, made entries on land on Roanoke river in Martin county; that thereafter, by fraudulent methods, in violation of the entry laws, these entries were so surveyed as to include a much larger number of acres than they called for, to wit, about 2,500 acres, including lot No. 1, while the entries purported to cover only about 350 acres, not including said lot.

The Attorney General alleged that the grant No. 465 to Samuel Smithwick was fraudulent and void for the reasons set forth in his information. He also alleged that Samuel Smithwick died, leaving the respondents named in the information his heirs at law; that several of them assigned and conveyed their interests or undivided shares in the land to Clayton Moore, who was made a party to the information. Thereafter the information was amended, and other persons, heirs of Samuel Smithwick, and the purchasers from the trustees of S. S. Simmons, were made parties and process issued for them. Thereafter, and on November 25, 1858, Clayton Moore filed his answer to the information, in which he gave a full account and history of the manner in which he became the owner of the interest of the heirs of Samuel Smithwick. He alleges that he has not, in his possession, the plat attached to the grant, and does not know the exact boundaries thereof; that

"the land conveyed in said grant is believed to lie between Williamston and Jamesville in Martin county, and surrounded by the waters of Roanoke river and Devil's Gut, forming an island, the whole of which contains 8,000 or 10,000 acres, and is chiefly low, boggy, densely thick with reeds, briars, and undergrowth, nearly level with the tidewater, unclaimable by ditching for agricultural purposes, and almost valueless but for the timber thereon and the privilege of hog range," etc. Record, pp. 15, 16.

He further avers that:

"Respondent has gotten no lumber on said land since complainant's bill was filed, nor for 2 years previous thereto, and he does not believe he at any time worked on more than 50 acres of it, and the working was principally, if not entirely, on that portion not included in the grant of the Literary Board to John B. Beasley."

He further states that:

"Since the filing of the information he hath assigned and conveyed, by deed duly executed and registered, to one Samuel S. Simmons and his heirs and assigns, all the right, title, and interest which he at any time purchased from the heirs and devisees of the said Samuel Smithwick, except the privilege of using said land in a certain way specified in said deed of conveyance. This defendant is informed and believes that the said Samuel S. Simmons hath conveyed all his right and interest in the lands embraced in the boundaries of the grant, to Hezekiah G. Spruill and Charles L. Pettigrew and Latham in trust for certain purposes as they have sold and conveyed the same to Dennis Simmons, William Simmons, and C. W. Grandy, associated as Simmons, Davis & Co., who are now the owners of the same. The interest reserved to the defendant by his deed aforesaid is of little value to him, and he doth surrender and release to the state whatever right, interest, or title is reserved to this defendant in and by said deed. Besides this reservation, this defendant has no right whatever in said lands, and if said Simmons, Davis & Co. shall desire or consent to have the said grant vacated and annulled, and the same may be done without prejudice to this defendant and without in any wise making him responsible for any loss or damage which may accrue to Samuel S. Simmons, or those claiming under him on account or by reason of this defendant's conveyance to said Samuel S. Simmons, this defendant will submit that the same may be done, and doth hereby give his assent thereto."

The latter portion of the answer is explained by reference to a deed executed by Clayton Moore to S. S. Simmons, bearing date September 15, 1853, in which he conveys to Simmons, in consideration of $8,000, " 'all the right and interest to all cypress timber, both standing and down, on his, the said Clayton Moore's land, lying and being on an island in the county aforesaid, known by the name of Devil's Gut Pocosin, bounded on the east and north by Roanoke river, on the west by Speller's creek and on the south by Devil's Gut,' saving the right to himself and children of getting what cypress they need for shingles, for use on his farm known as Bald Gray." This deed was duly proven and recorded March, 1859. The description covers a large body of land, including lot No. 1. At the date of this deed the title to lot No. 1 was vested in John B. Beasley, by the deed from the Literary Board, dated September 23, 1852. It is manifest that Clayton Moore in his answer was not referring to the land contained in lot No. 1, but to the lands which he claimed under the several deeds from the heirs of Samuel Smithwick, the timber upon which he had sold to S. S. Simmons. His answer is explicit as to this.

Defendant insists that, at the date of the deed from the Literary Fund Board to John B. Beasley, the title to all of the land included within the boundaries of grant No. 465 to Smithwick, was in the heirs of Smithwick and Clayton Moore; that therefore no title passed or vested in John B. Beasley; that the legal effect of the decree of the

Supreme Court in the information rendered at June term, 1859, vacating the grant, vested the title in the state and that, by virtue of the provisions of the act of 1836 (Rev. Stat. c. 67, § 3; Revisal 1905, §§ 1693–94), by which "all the swamp lands of this state, not heretofore duly entered and granted to individuals, shall be vested" in the President and Directors of the Literary Fund of North Carolina, etc., the title vested in the corporation created by that statute; that the deed of September 29, 1859, from the President and Directors of this Fund to Dennis Simmons and others, grantees of Spruill and others, trustees of S. S. Simmons, conveyed to and vested in said Dennis Simmons and others the title to lot No. 1, and that from and after the execution of that deed they and their successors in title held possession under this deed, and therefore adverse to the title which Clayton Moore derived through Beasley. If this contention be sustained, it follows that Dennis Simmons' and his associates' claim of title to the timber was not dependent upon, or in subordination to, the title of Clayton Moore. It appears from recitals found in the deeds in evidence that prior to the rendition of the decree of the Supreme Court, Dennis Simmons and his associates entered into a contract with the President, etc., of the Literary Fund for the purchase of their interest in the land covered by grant No. 465 to Smithwick. This grant, as appears by the map on file in the records in the information, covers a very large body of swamp land, some 2,500 or 3,000 acres, including lot No. 1.

In the light of the fact that the President of the Board had, on September 15, 1852, conveyed a portion of the island by metes and bounds to John B. Beasley, for a valuable consideration, it is not only unreasonable, but a reflection on their good faith, the Governor and two well-known, prominent citizens of the state, to suppose that they intended to invalidate that title. By so interpreting the records, deeds, and the conduct of all of the parties and concluding that they were referring to, and dealing with, that portion of the Devil's Gut Pocosin, or Island, not covered by the deed to Beasley, we reconcile their dealings with admitted conditions, facts, and perfect good faith. They were all men of intelligence and character. Their conduct should be explained in the light of, and consistently with, that fact. I conclude, and find as a reasonable inference, that it was not their purpose to call into question, or disturb, the title of any of the parties to lot No. 1, and that the deed of September 29, 1859, was not intended to affect the title of Clayton Moore thereto. It would seem that the President, etc., of the Literary Fund would be estopped by their deed to John B. Beasley to deny that they had title to the land conveyed to him.

[3] There is, however, another view of the question which leads to the same result. The Legislature, by act of 1836, created and declared to be incorporated into a body politic and corporate "a board of literature" to be denominated and called the "President and Directors of the Literary Fund of North Carolina." The Governor of the state, by virtue of his office, was made president, and the other members to be nominated and appointed by the Governor, under and with the advice of his council. Section 3 of the act provides that:

"All the swamp land of this state, not heretofore duly entered and granted to individuals, shall be vested in the said corporation and successors, in trust, as a public fund for education and the establishment of common schools."

The board was authorized to have the swamp lands surveyed and reclaimed, to sell them, etc. If the land covered by the Smithwick grant No. 465 had not been "duly entered and granted," the title to it was, by virtue of this act on, and after, its passage, in the President, etc., of the Literary Fund, and their deed to Beasley conveyed a perfect title. The Attorney General, in his information, alleged a number of reasons why, under the statute, the grant was "void and ought to be repealed, rescinded, and annulled, and that the enrollment thereof in the office of the secretary of state may be canceled." The decree recites the invalidating facts set out in the information, and decrees that the grant be annulled, vacated, and canceled. The legal import and effect of this decree is to adjudge that the land has never been "duly entered and granted" ; hence, the vacation and cancellation of the grant does not create in the state or the President of the Literary Fund a new title from, and after, its rendition, but operates to remove the cloud upon the title, created by the invalid grant. This decree inures to the benefit of those holding the title under the deed to Beasley. Manifestly, this was known to, and understood by, the Governor of the state, a former judge, and Mr. Moore, a lawyer of more than usual learning. I am therefore of the opinion that no new or independent title vested in Dennis Simmons and his associates by the deed of September 29, 1859, from the President of the Literary Fund.

On February 2, 1859, W. H. Davis conveyed to his associates, D. D. Simmons, William Simmons, C. W. Grandy, and Dennis Simmons all of his right, title, and interest, being two undivided fifths, in all of the lands' and negroes, and other personal property conveyed to them by the trustees of S. S. Simmons. He conveys "also the said Davis' interest in the Devil's Gut Pocosin, contracted to be purchased from the Literary Board of North Carolina, title to which is to be made upon the payment of a note to said Literary Board of North Carolina of $2,000.00." It is not clear to what land this clause refers. It is probable that it referred to the land involved in the information pending in the Supreme Court. In a later clause Davis conveys "all his right, title and interest in the following law suits, viz.—a suit now pending in the Supreme Court of North Carolina to vacate a grant conducted by B. F. Moore, attorney at law." This, of course, refers to the information.

As the deed from the Literary Board of September 27, 1859, to Davis, Simmons & Co., did not change the relation created by the deed from S. S. Simmons to Clayton Moore, reserving the timber, nor the character of such possession which Dennis Simmons and his associates had under, and by virtue of, the reservation in that deed, it follows that they continued to cut and remove the timber under the license or authority conferred upon them, and in subordination to the title to the land vested in Clayton Moore.

No change was made in the status of Dennis Simmons and his associates, towards the title to the timber, until April 1, 1895, when Dennis Simmons instituted in the superior court of Martin county a special proceeding, making C. W. Grandy, and a number of other persons, defendants, alleging that he, together with said defendants, were the owners and in possession of a tract of land in said county, known as the Simmons, Grandy & Company Swamp, a description of which is set out, containing 5,000 acres. He prays that a decree may be entered, directing a sale of the land for partition, etc. Due proceedings being first had, the land was sold by Wheeler Martin, commissioner, to Dennis Simmons, at the price of $2,000, the sale confirmed, and a deed executed November 25, 1895. The description includes lot No. 1 within the boundaries of the 5,000 acres, known as the Simmons, Grandy Company Swamp. This deed is registered December 31, 1895.

It appears from recitals in other deeds that Dennis Simmons thereafter conveyed a one-half undivided interest in the land to C. W. Grandy and A. H. Grandy, of Norfolk. Thereafter Dennis Simmons died, leaving a last will and testament, appointing John D. Biggs and Dennis S. Biggs executors, who, on November 3, 1902, conveyed to defendant, Dennis Simmons Lumber Company "a one-half, undivided interest in that tract of land on Devil's Gut in Martin county, known as the Simmons and Grandy Swamp, said tract of land is fully described in deed from Wheeler Martin, commissioner."

[4] Counsel for defendants strongly stress the fact that the execution of the deed from S. S. Simmons to Clayton Moore was not proven in accordance with the provisions of section 981, Revisal 1905 (Acts 1885, c. 147). The certificate conforms to the provisions of sections 997, 998, Revisal 1905. These sections are codified from Acts 1899, c. 235; they are substantially the same as the provisions of the Code 1883. It will be observed that section 981, being section 2, c. 147, Acts 1885, introduced a new and additional method of probating deeds, executed prior to 1855, amended by Act 1905, c. 277, to apply to deeds executed prior to 1870. This provision was made in view of the change in the registration law, introduced by Acts 1885, c. 147, to enable those who, relying on the law existing prior to that time, had neglected to have their deeds proven and registered, when the maker and witnesses were dead, or could not be found, in which case the person holding, or claiming title under such deeds, were enabled, upon making affidavit in the form prescribed, to have their deeds admitted to probate and registration, without proof of the handwriting of either. This statute did not repeal the existing statutes, permitting deeds to be registered upon proof of the handwriting of the maker, or witnesses when they were dead. It simply provided an additional method of proving deeds, when executed, 30 years prior to the passage of the statute. Sections 997 and 998 of the Revisal of 1905 are the same as the act of 1899 (chapter 235), which was in force November 1, 1902, when the probate of the deed from S. S. Simmons to Clayton Moore was taken. As a guaranty that the ancient deed was in the custody of some person interested in the title to the land, section 981 required that it be produced by some person

holding such deed, or claiming title thereunder. The further, and very wise, provision was inserted in 1905 that the person producing the deed make affidavit that he believed it to be genuine. This provision is held to be mandatory in Allen v. Burch, 142 N. C. 524, 55 S. E. 354.

[5] I am of the opinion that the probate is valid, under section 997. The grantee, Clayton Moore, died in 1881, leaving as executor and trustee his son, James E. Moore, a lawyer of large practice, residing at Williamston, N. C., within a few miles of the land and familiar with the use to which it was being subjected. He was also one of the devisees. Mrs. Hattie E. Thigpen, administratrix d. b. n. of Clayton Moore, who sold the land and the witnesses who proved the handwriting of the maker of, and witness to, the deed, are dead. The original is not produced nor accounted for. The executors of Dennis Simmons are dead. There is no suggestion as to what became of the deed after registration, or in whose possession it is now. Defendant insists that the court should find, as a fact, that the deed was never delivered. That the length of time elapsing between its execution and registration, coupled with other facts, are sufficient to rebut the presumption of delivery raised by its registration. It is settled that probate and registration of a deed furnishes presumptive proof of its delivery. Buchanan v. Clark, 164 N. C. 66, 80 S. E. 424. While there is an unfortunate want of evidence, explanatory of the retention of the deed from registration for 50 years, it is manifest that no one, other than the representatives of Clayton Moore, were interested in causing it to be proven and registered. I think that the presumption, based upon experience, should prevail, and that the court must assume that the deed was delivered to Clayton Moore.

On November 10, 1905, Mrs. Hattie E. Thigpen, administratrix and trustee, conveyed to John T. Lynch 10 tracts of land in Bertie and Martin counties, described by reference to the deeds to Clayton Moore, including the deed from "S. S. Simmons, dated December 20, 1853, and recorded in Deed Book J. J. T., page 109 Martin County Registry." The consideration named in the deed is "ten dollars and other valuable considerations." Mr. Lynch says that he paid for the lands conveyed something like $5,000.

The evidence, or the weight of it, shows that, for many years after the Civil War, Dennis Simmons, for himself and his associates, cut large quantities of cypress from Devil's Gut Pocosin. The Dennis Simmons Lumber Company had a mill at a place indicated on the plat or map as "Astoria," which appears to be the "old field landing" referred to in the deed, conveying the timber by Clayton Moore to S. S. Simmons, of September 15, 1853. The timber was sawed by this mill. The deed from Wheeler Martin, commissioner, did not change the relation of the parties. The proceeding for partition had no other effect than to extinguish the title of the defendants in the proceeding and vest it in Dennis Simmons.

The deed made by John D. Biggs and Dennis Biggs, executors of Dennis Simmons, deceased, to the Dennis Simmons Lumber Company, of November 3, 1902, brought a new party into connection with the

land, and title. There is no evidence fixing either the executors, or the corporation, with notice of the Clayton Moore deed, except from its registration, November 3, 1902, being the same day upon which the executors conveyed the land to the defendant. The deed from the executors describes the land as the tract, "lying on Devil's Gut in Martin county, known as the Simmons Grandy Swamp." It was sold at public auction at the courthouse door in Williamston, N. C. The deed from the executors was put to registration November 5, 1902, and the grantee, the Dennis Simmons Lumber Company, began cutting, not only cypress, of which there was but a small quantity then on the land, but ash and gum. It listed the land for taxes, and has paid tax thereon each year since. The legal title after the death of James E. Moore, executor and trustee, was in Mrs. Hattie E. Thigpen, administratrix c. t. a. d. b. n. and trustee under Clayton Moore's will. She was substituted by decree of the superior court after the death of James E. Moore. If the execution of the deed by the executors of Dennis Simmons, and the entry by the grantee, claiming under it, operated as an ouster of Mrs. Thigpen, trustee, she had a complete cause of action against the defendant corporation, and if such ouster was followed by adverse possession, she and those claiming under her were barred of their action at the end of 7 years. Mrs. Hattie E. Thigpen conveyed to John T. Lynch and Robert E. White November 10, 1905. The deed to the Dennis Simmons Lumber Company was then, and had for 2 years been, registered.

The definition of a disseisin, which will give to the disseisor a right of action, is elementary. A possession to be adverse must be actual and open, under an assertion of title, and the intention to hold such possession against the true owner. "There must concur, at the same time, the factum—possession, and the intention—a claim of ownership, as it is said. The fact of the possession, and the intention with which it was commenced and held are the only tests' of whether a possession be adverse." Sedgwick and Wait, Trial of Title, § 754; Parker v. Banks, 79 N. C. 480. The intention must be ascertained as a fact from the relation of the parties, and from the character of the possession, and acts of ownership. If these are sufficiently definite, open, and exclusive, it will be presumed that they are done with the intent to appropriate the land. By such acts, it is said that party proclaims to the public that he asserts an exclusive ownership over the land.

"An entry by one man on the land of another is an ouster of the legal possession arising from the title, or not, according to the intention with which it is done; if made under a claim and color of right, it is an ouster; otherwise it is a mere trespass, in legal language the intention guides the entry and fixes its character." Ewing v. Burnet, 11 Pet. 53, 9 L. Ed. 624. "Neither actual occupation, cultivation or residence are necessary to constitute actual possession; * * * when the property is so situate as not to admit of any permanent useful improvement: and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim." Id.

[6] It would be to run counter to the manifest truth to infer, as a fact, that the defendant, Dennis Simmons Lumber Company, took the title to and cut the timber from the land in subordination to the title of the representative of Clayton Moore. Presumptions are indulged by the courts, in the absence of evidence, throwing light upon the question to be decided. He who alleges that he is in the adverse possession of land is required to prove it—the presumption is that he holds in subordination to the true title. When, however, his conduct is inconsistent with such presumption and is of such open, notorious character as to exclude reasonable doubt, the court should find the fact in accordance with what it believes to be the truth.

[7] There is room for doubt whether the reservation of the timber made in the deed from S. S. Simmons to Clayton Moore included any other than the cypress. The terms are "saving and excepting and reserving to him, the said S. S. Simmons, his heirs and assigns, all the timber on the said land and the privilege of working up said timber into shingles and making roads and cutting canals and building houses for the convenience of his, or their, hands, in getting shingles upon said land." All of the witnesses say that it was, at the date of its execution, and for many years thereafter, known as a "shingle swamp" or a "cypress swamp." S. S. Simmons was engaged in making shingles. Its value as a "gum swamp" is of recent date. Notwithstanding this, the defendant, maintaining a mill near the land, cut large quantities of ash and gum from the land, until the mill was burned about 4 or 5 years ago. The fact that the Clayton Moore deed was put on the record the same day that the defendant purchased is strong evidence that its officers knew of its existence, and asserted that they had the better title, making manifest their claim, by listing the land and paying the tax thereon, and cutting and removing ash and gum, as well as cypress timber therefrom.

It is held in this state that the execution of a deed by one tenant in common, purporting to convey title to the entire tract, followed by the exclusive possession of the grantee, does not create an ouster of the other tenant. Day v. Howard, 73 N. C. 1; Caldwell v. Neely, 81 N. C. 114. This is not in accordance with the decisions of other courts. The law, as held by the Supreme Court of the United States, and many of the state courts, is thus stated by Sedgwick and Wait:

"When the grantee has obtained a conveyance of the whole estate from one of the cotenants, entry made under such title is a disseisin of the other cotenants. This is just and reasonable, for the grantee does not intend to hold under the other cotenants. His entry is adverse." Section 287.

In Bradstreet v. Huntington, 5 Pet. 402, 8 L. Ed. 170, it is held that if one tenant in common undertake to convey the whole and the grantee enter into the actual possession, intending to claim the whole, he is not precluded from setting up his possession thus acquired, as a bar under the statute of limitations. Judge Johnson says:

"The fact to be determined is whether the party holds possession for himself, or for another; and this can only be determined by evidence, or circumstances to prove the one or the other. It is the inquiry into the 'quo animo.'

In all these cases there is no intimation found that the adverse possession may not be set up; the only point maintained is that the 'quo animo' must be established as well as the fact. But in finding the quo animo, the jury must of course be left to their own view of the effect and sufficiency of the evidence. Actual ouster is clearly not requisite, either to be presumed or proved."

In Clymer v. Dawkins,. 3 How. 677, 11 L. Ed. 778, Judge Story, quoting from a very early English authority, says:

"That where there are two coparceners of a manor, if one enters and makes a feoffment in fee of the whole manor, this feoffment not only passes the moiety of such coparcener, which she might lawfully part with, but also the other moiety of the other coparcener, by disseisin. This decision was fully confirmed and acted on, in the recent case of Doe d. of Reed v. Taylor, 5 Barn. & Adolph. 575, where the true distinction was stated that, although the general rule is that, where several persons have a right and one of them enters generally, it shall be an entry for all; for the entry generally shall always be taken according to right; yet that any overt act, or conveyance, by which the party entering, or conveying, asserted a title to the entirety, would amount to a disseisin of the other parties whether joint-tenants, or tenants in common, or parceners,". citing Jackson v. Smith, 13 Johns. (N. Y.) 406, and Bigelow v. Jones, 10 Pick. (Mass.) 161, and concluding: "The reason of both of these latter cases is precisely the same as in the case of a feoffment, the notoriety of the entry and possession, under an adverse title to the entirety of the land."

While a deed made by one tenant in common for the entire title to the whole tract of land is not strictly analogous to the facts in this case, the principle upon which the conclusion is based would seem to be the same—assertion of title to the land, followed by an entry. Assuming that the legal title to the land was in the representatives of Clayton Moore, and the timber standing upon it in Dennis Simmons, neither he, nor his executors, could, by their deed, convey any larger interest in the land than they owned; hence the deed of the executors, purporting to convey the land, which included the timber, was inoperative to convey the land. When it was registered and the grantee entered, claiming to own the land under the deed, it was an ouster of the true owner, a refusal to recognize her right. The registration had the same effect as to the notoriety of the claim, as the ceremony known by the common law, as livery of seisin. Revisal 1905, § 979. The entry, under such circumstances, was an assertion of ownership—it repudiated the allegiance which had existed between S. S. Simmons and Clayton Moore—it was an ouster and worked a disseisin. This was followed by listing the land and payment of taxes, which the courts recognize as an act denoting the character of the claim under which possession is held.

The fact that the representative of Clayton Moore put his deed to registration on the same day upon which the land was sold publicly is very strong evidence that they knew that their title was denied. Up to that time they may have assumed that Dennis Simmons knew that he was cutting timber under the reservation in the deed, as he did as the representative of his uncle, S. S. Simmons, from 1853 to 1856. His executors were now repudiating such claim and selling the land.

It is difficult to understand why Mrs. Thigpen, the executor and trustee, under the will of her father, for two years thereafter, remained inactive. As appears of record, she had counsel learned in the law. She was put upon notice that the defendant had entered upon and was asserting ownership of the land, under a deed purporting to convey, not the timber, but the land.

I am of the opinion that, whatever presumptions may have been indulged in regard to the relations of the parties up to this time must be abandoned, and that the defendant, purchaser, and grantee of the executors of Dennis Simmons must be regarded as claiming the land adversely to the representatives of Clayton Moore, and that the entry—cutting and removing timber, registering its deed, listing the land for taxes, and paying taxes thereon, operated as a disseisin—an ouster of those claiming under Clayton Moore. There is no other reasonable or satisfactory explanation of the conduct of defendant.

[8] Was defendant in the adverse possession of the land for 7 years from and after November 3, 1902? The evidence tends to show that defendant Dennis Simmons Lumber Company had two mills at Astoria, one for sawing pine logs, and one for sawing the cypress, ash, and gum logs; that for some years prior to the death of Dennis Simmons, he had, by hired hands, or under other contracts, kept a force in the swamp, cutting logs, which were delivered to, and cut by, the mill. There was but little demand for gum timber prior to 1902; the witnesses concur in saying that it became profitable to cut gum about 15 years ago. It appears from the testimony that but a small quantity of original growth of cypress was then in the swamp; there was considerable "buck cypress," a second growth.

John T. Lynch says that he first knew of the land in controversy "about 1890"; that he took an option on it from Mrs. Hattie E. Thigpen—he does not give the date of the option—it is not introduced in evidence; that when he began to cut the gum, the president of defendant company sent for him, and notified him that he claimed to own the land. They made an agreement to have it surveyed. He employed Mr. Ange to do so, but he never made the survey. He cut no timber on the land thereafter. He says that he stayed around Williamston several years. It appears from deeds and mortgages in evidence that Lynch and White conveyed to W. C. Manning, trustee, November 10, 1905, for the purpose of securing the payment of a bond executed by them to Mrs. Hattie E. Thigpen, administratrix and trustee, for $3,-500. This deed was registered November 23, 1905. By successive conveyances, such title as vested in Lynch and White passed to and vested in the plaintiff, Emil Guenther, March 10, 1913. Mrs. Thigpen, administratrix, listed and paid the tax on 3,000 acres of land in Jamesville township, listed as "Devil's Gut," for the years from 1901 to 1905, inclusive. In 1906 and 1908 the land was listed only by Dennis Simmons Lumber Company. During the years 1909 to 1915, inclusive, it was listed by the Jamesville Lumber & Pulpwood Company; this company held the Lynch and White title, during those years. Plaintiff has listed the land and paid the tax since 1915. The records of Martin

county were destroyed during the year 1885; hence it does not appear who, if any one, listed the lands prior to that date. There is nothing to indicate that James E. Moore, executor of Clayton Moore, listed the lands in controversy. It thus appears that since 1900, the lands have been listed by those claiming under Clayton Moore, and since 1902 by defendant.

John T. Lynch says that "to the best of his knowledge" the swamp "has not been operated at all in the past 12 or 14 years;" that he has "been over it nearly every year to some extent." He resides in Rochester, N. Y., but says that he employed Mr. Warrenton to watch it for him. It appears from the deeds and the evidence that Lynch and the corporations with which he was associated, owned other timber, swamp lands on the Roanoke river, on the Bertie side. Warrenton says that he never guarded the Devil's Gut Swamp for Lynch. He did guard, for him, the land on the Bertie side of the river. Has never known of any one guarding Devil's Gut Swamp for Lynch. This appears to be the only evidence of any act or assertion of title, other than taking and recording the deed, listing and paying the taxes, on the part of Lynch and his associates.

Defendant introduced several witnesses, who testify that they cut timber, ash, cypress and gum, on the land for the defendant, Dennis Simmons Lumber Company, from 1902, until the mill was burned about 4 years ago; that the timber was cut at the mill situate at Astoria.

Augustus Moore, 62 years old, says that he cut timber from the land during Dennis Simmons' life, and since his death, for defendant. He says:

"There never was any time but what somebody was doing something in there until the last few years, since they stopped. About 4 years, I think. They had a mill, and they manufactured gum and pine lumber. They had both a gum mill and a pine mill, and both got burned. Since then they stopped manufacturing anything but pine. I wouldn't say positively how long ago it was."

He was asked:

"How long since you have done any work on this land for the Dennis Simmons Lumber Company?

—to which he responded:

"Just before the mill was burnt; cannot fix the exact date. Q. The Dennis Simmons Lumber Company also claimed the timber outside of what was called, or what is called now, the Clayton Moore land? A. They claimed to own about 5,000 acres in there, was my understanding. They worked the timber at different times all over that swamp from the White Cypress Swamp to that Shaw Swamp, we called it, through the David Smiddick line."

Modlin says that he has cut timber in the swamp for Dennis Simmons, John D. Biggs, and "the other owners." He is asked, "You feel compelled to testify that the Dennis Simmons Lumber Company were working cypress during all that period?" He answered, "Yes, sir; was cutting cypress and ash—the mill was burned 4 years ago."

Henry Spruill, an old colored man, preacher, 72 years old, says: That he began working in the swamp for Dennis Simmons 1855.

Worked for Simmons Grandy Company until the war commenced. After the war he returned to work, and continued until Mr. Simmons died. Continued working there until the mill was burned. Has known as many as 50, 60, or 100 working in the swamp, around the head of Lower Dead Water. That Dennis Simmons Lumber Company worked from Speller's creek to Lower Dead Water. There was "a big mill and a small one at Astoria. Cut pine, cypress, gum and ash." "Floated timber there before the mill burned, contracting for the Dennis Simmons Lumber Company." Saw signs where the gum had been cut away "very largely."

Leary says that he cut timber in the swamp 40 years ago. "I have cut on Lower Dead Water, Upper Dead Water, and also up the north side, what is known as the Shaw Swamp for the Dennis Simmons Lumber Company."

Coltrain says: "We cut generally. Thought all belonged to the Dennis Simmons Lumber Company."

Griffin says that he is well acquainted with the swamp. Has worked on it for the Dennis Simmons Lumber Company—handled cypress and ash—until the mill was burned.

Sexton says that he worked the swamp for the Dennis Simmons Lumber Company. Worked at the pine mill. Has seen gum logs come from the swamp. "Has measured many a one—measured 3 or 4 years. Can't hardly say how much. Have seen 75,000 to 100,000 feet of it on the yard at a time piled up; not many times. There was a big quantity of it cut, 10,000 to 30,000 at a time. Have seen more than that on the river. Sawed gum there two or three years. Began 12 or 14 years ago. They didn't saw gum regular—not that much all the time. Think they cut for a year or two from 5,000 to 8,000 a day." He says the gum did not come into demand until some time after he commenced working for the Dennis Simmons Lumber Company, about 13 or 15 years since they commenced cutting gum first. There was not much demand at first. They cut it for a factory they had at Williamston. After they quit cutting for that factory, they went to cutting a good lot of it—about 13 years ago. Cut out the large ash—there was more gum than there was ash. It was a "gum cypress swamp."

W. L. Moore says that the Dennis Simmons Lumber Company got about all the gum they could reach, that was convenient. They didn't care who knew it.

Gardner says that he worked in the swamp "about 10 or 12 years ago. Mr. Biggs told me to cut 25,000 feet of sweet gum. I cut it between the mouth of Speller's Creek and the place known as the Flood Place on the south side of Devil's Gut. Have cut gum on Upper Dead Water—brother cut there. Went to Dennis Simmons Lumber Company mill."

Calloway says that he began working for the Dennis Simmons Lumber Company, 1903. Worked until 1912. They commenced cutting gum in Devil's Gut Pocosin about 15 years ago, and piled it on the yard. For a year or two they cut nothing in the little mill but gum. Capacity 18,000 or 20,000 feet a day. Worked on the river. Got logs

down on the water. Gum has been taken up the swamp "a good, long time, 12 or 13 years that I can remember about. Cut ash too. The last raft I cut was in 1912."

Lilley says that he worked in the swamp for Dennis Simmons Lumber Company. Upper and Lower Dead Water. "Somebody has been at work there all the time." Got cypress, ash, and gum. Handled more ash and cypress than gum—some gum went to the Astoria mill—burned 4 or 5 years ago.

Modlin says that for many years he has seen men working in the swamp. "You mean working for the Dennis Simmons Lumber Company?" "Yes, sir." "What have you known about anybody pretending to exercise any authority over that land for Mr. Lynch?" "No, sir; I haven't known anybody to, for them. All I have known has been for the Dennis Simmons Lumber Company. All the money that I got, I got from that company." Worked cypress, ash, and some gum.

It appears that Lynch, or the corporation claiming under him, cut timber from land on the Bertie side of the river, near to the land in controversy. I have endeavored to analyze the testimony regarding the possession of the Dennis Simmons Lumber Company since the execution of the deed by the executors of Dennis Simmons. The witnesses, who are men who worked in the swamp, agree in respect to the location of the work, indicating the extent of the cutting.

In view of the character of the land, the growth upon it, and the use to which it is capable of being subjected, I am of the opinion that the defendant, Dennis Simmons Lumber Company, has been in the open, exclusive, adverse possession of tract No. 1 for more than 7 years from and after, the registration of the deed from the executors of Dennis Simmons November 21, 1902.

This being a suit in equity to quiet plaintiff's title and remove cloud therefrom, I am of the opinion that the plaintiff, and those under whom he claims, has been guilty of such laches as will bar his suit for equitable relief.

Without reviewing the complicated transactions developed in this case, it is difficult to avoid the thought that, although aided by learned and diligent counsel, it is impossible, after so long a time since the various deeds were executed and transactions took place—all of the parties to them being dead—to reach a satisfactory conclusion.

Clayton Moore lived 28 years after the execution of the deed to him from S. S. Simmons, with the fact called to his attention, by the information that S. S. Simmons had undertaken to convey the land to his trustees, and that they had conveyed to Dennis Simmons and his associates, whose deeds were promptly registered. He failed to put his deed to registration. His son, James E. Moore, his executor, and named as trustee, was a learned, and, for many years the most prominent, lawyer of the county. He survived his father 17 years, and failed to register the deed. Although the General Assembly of the state, 1885, enacted a statute requiring all deeds to be registered, to validate them as against purchasers for value, this deed was not registered. In 1895, three years before Mr. James E. Moore's death, Den-

nis Simmons instituted a proceeding in the superior court of Martin county against a large number of persons, alleging that they, together with himself, were the owners and in possession of the land in controversy. It was sold at public auction and purchased by Dennis Simmons. The deed from the commissioner, setting out the boundaries, was registered. It is difficult to avoid the conclusion that Mr. Moore had knowledge of this proceeding and sale. It was an assertion by Simmons of ownership of the land. Mr. Moore does not cause the deed to be registered, or make any claim to be the owner of the land. It is not until gum timber becomes of value that Mrs. Hattie E. Thigpen, who succeeded her brother, James E. Moore, as the representative of Clayton Moore, puts the deed to registration. The original deed is not now produced, nor its absence accounted for. Thus plaintiff's title is dependent upon a deed withheld from registration for 50 years, until every person who could possibly have known of the circumstances under which it was held is dead. The witnesses by whom the handwriting of the maker and attesting witness could have been proven are dead. It is singular that Mr. Lynch, who must have known of the sale by the executors of Dennis Simmons, and the deed to the Dennis Simmons Lumber Company, and as shown by his own evidence, notified by its president that the company claimed to own the swamp, takes no action to assert title. The land has been, during the 11 years intervening between 1902 and 1913, conveyed to several corporations, neither of which has attempted to cut any timber, or by any other act assert ownership. These facts, all of which are uncontroverted, bring the case within the well-recognized principle announced by the Supreme Court in Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718, in which it is said:

"Independently of any statutes of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights, and shows no excuse for his laches in asserting them. 'A court of equity' * * * has always refused to aid stale demands, where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence."

In Jenkins v. Pye, 12 Pet. 251, 9 L. Ed. 1070, it is said:

"Lapse of time, and the death of parties to the deed, have always been considered, in a court of chancery, entitled to great weight, and almost controlling circumstances," in this case. Naylor v. Foreman-Blades Lumber Co. (D. C.) 230 Fed. 658.

We are thus brought to a consideration of the evidence in regard to the other tracts in controversy.

### Tract No. 2.

This tract shown on the map as the "William Gardner, or Rayner, tract" is covered by a grant from the state March 23, 1820, to William Gardner. This grant took the title out of the state, and is not affected by the fact that a part of it is covered by grant No. 465 to Samuel Smithwick, which was vacated by the decree rendered in the information referred to, discussing the title to tract No. 1. The title

never vested in the Literary Board; hence its deed of 1859 to Simmons, Davis & Co. did not vest any title in the grantees.

I do not find in the evidence any deed from William Gardner. Plaintiff introduced a deed from Kenneth Rayner to Clayton Moore, dated September 3, 1847, reciting that it "is the same land conveyed by Samuel Williams and Ambrose Gardner to my father, Amos Rayner, as by reference to said deed will more fully appear." This recital is competent only as against parties claiming under Kenneth Rayner, but is no evidence against strangers, who do not claim under him. If, however, the recital be taken as true, it does not show that William and Ambrose Gardner had the title of William Gardner, nor does it show title in Kenneth Rayner; it simply recites that William and Ambrose Gardner conveyed to Amos, the father of Kenneth Rayner.

Plaintiff introduced a deed from William Gardner, dated March 21, 1820 (being six days prior to the date of the grant to him), in which Gardner conveys to Horace Ely a portion, by metes and bounds, of the 500 acres, for which he held warrants Nos. 137–259, containing 200 acres. While Gardner had only a warrant at the date of this deed, when he obtained the grant March 27, 1820, for the entire entry, Ely's title was perfected by estoppel. While Mr. Peel, the surveyor, locates the grant according to the calls, he does not locate the 200 acres conveyed out of it to Ely. Samuel Sheppard, sheriff of Martin county, July 23, 1836, executed a deed conveying Horace Ely's part of the Gardner grant to Eugene Burruss. This deed recites an execution in the hands of the sheriff against Ely and sale thereunder. The records of Martin county are destroyed. The recitals, in view of the length of time elapsing, may be taken as true.

Burruss, on September 27, 1837, conveyed to Joshua Robertson, "every description of real estate to which the said Burruss has any right, title or interest, lying either in the county of Martin or Bertie." This deed conveyed to Robertson, in trust to sell the property and pay certain debts, etc. Joshua Robertson, trustee, on January 13, 1838, conveyed the same land which Gardner had conveyed to Ely, by particular description, to Clayton Moore. All of these deeds were duly registered, within a short time after their execution. They put 200 acres of the Gardner tract No. 2 in Clayton Moore; the remainder, so far as appears, is in the representatives of William Gardner.

Unless the title of Clayton Moore to the 200 acres has been divested, it passed to Lynch by the deed of Mrs. Thigpen, November 20, 1905, and by mesne conveyances vested in the plaintiff. The only deed which could give to defendant, or to Dennis Simmons, color of title to this land is that of Wheeler Martin, commissioner, of November 25, 1895. It will be noted that Clayton Moore, on November 4, 1847, conveyed to Edmund S. Moore, the William Gardner land, or the interest therein "which he acquired under the Kenneth Rayner deed." The deed from Martin, commissioner, expressly excepts, in the boundary, the E. S. Moore land. See Exhibits D 21 and D 8.

It is manifest, therefore, that defendant took no part of this tract under the deed from the executors of Dennis Simmons. Whatever interest was vested in Clayton Moore, at his death, passed to Lynch

and belongs to plaintiff. While I am unable to fix this interest, it will be decreed that, as against the defendant, the 200 acres of this tract, owned by Clayton Moore, is in plaintiff. The deed from Clayton Moore to E. S. Moore is confined to the interest of William and Ambrose Gardner; that which he acquired under the Robertson deed is not affected.

Tracts 3–8.

Without pausing to inquire whether the deed from S. S. Simmons to Spruill, Pettigrew and Latham, trustees, covered the smaller tracts, as located on the map, and their deed to Dennis Simmons, and his associates, covered them, it is clear that the deed from Wheeler Martin, commissioner, to Dennis Simmons of November 25, 1895, does include them in its boundaries. The calls in this deed begin at A and, excluding the E. S. Moore (Gardner tract), run to B, C, D, E, F, G, H, I, J, K, L, M, N, to A, and, as will be seen by an examination of the plat, or map, include the tracts numbered from 3 to 8, inclusive. The description contained in the deed from the president, etc., of the Literary Fund to Dennis Simmons and his associates covers all of this land. As to such portion of it as is included in the Samuel Smithwick grant No. 465, which was vacated, this deed vested in the grantees a perfect title, unless it had been granted to other grantees, prior to the date of the Smithwick grant No. 465.

Tract No. 3 was granted to Edmund Smithwick by grant, November 10, 1784, and to Samuel Smithwick, December 20, 1791.

Tract No. 4 was granted to Samuel Smithwick December 20, 1791.

Tract No. 5 was granted to Edmundson Smithwick November 10, 1784.

Tract No. 6 was granted to Samuel Smithwick December 20, 1791.

As title to these tracts was out of the state prior to the act of 1836, by "grants duly issued," and not dependent upon the Samuel Smithwick grant No. 465, the decree vacating that grant did not affect or invalidate the title to the grantees. The deeds introduced by plaintiff appear to put the legal title to these tracts in Clayton Moore, prior to September 15, 1853. In so far as his title was supported by deeds based upon grants issuing prior to November 4, 1800, such title was not divested by the decree, the legal effect of which was to vacate and cancel the grant to Samuel Smithwick, No. 465, although it appears from the survey to include lands covered by other and prior grants. This decree did not affect tracts granted prior to November 4, 1800. Assuming that Clayton Moore was the owner of these tracts, he conveyed to S. S. Simmons, on September 15, 1853, "all of the cypress timber, both standing and down, on his, the said Clayton Moore's land, lying and being on an island in the county aforesaid, known by the name of Devil's Gut Pocosin, bounded on the east and north by Roanoke river, on the west by Speller's creek and on the south by Devil's Gut." This description includes all of the land included in Devil's Gut Pocosin, then owned by Clayton Moore. It will be observed that this land never belonged to S. S. Simmons. The description calls for "the following tract of land in Martin county—a tract of cypress swamp lands, con-

taining 600 acres, more or less, purchased from * * * Clayton Moore." While it was doubtless the intention of S. S. Simmons to convey to his trustees "the cypress timber" purchased from Clayton Moore, his deed does not aptly describe it. The trustees conveyed to Dennis Simmons and his associates by the same description. It would seem, therefore, that the cutting of cypress timber by Dennis Simmons and his associates from 1856 until the death of Simmons was without any right to do so. That the title to the cypress timber remained in S. S. Simmons. However that may be, it is clear that Dennis Simmons asserted ownership, and possession, of the land from and after the deed from Wheeler Martin, commissioner, November 25, 1895. His executors sold and conveyed it to the Dennis Simmons Lumber Company, November 31, 1902. The evidence of acts of possession and claim of ownership, in respect to the portion of the swamp covered by these tracts, is the same as that in regard to tract No. 1. The defendant has been in the open, exclusive possession of tracts Nos. 3 to 8, inclusive, for more than 7 years, thus ripening its title thereto, as against plaintiff, claiming under Clayton Moore. Of the many controversies growing out of the confusion of title and boundaries of the swamp lands in Eastern North Carolina, which by reason of the rival claims growing out of the increased value of cypress and gum, none have presented more difficult and doubtful questions of law and fact. I have given the evidence and the helpful arguments and briefs most anxious consideration. It is impossible to exclude doubts from the mind in regard to the correctness of the conclusion reached. If the plaintiff fails to secure the property which, I am sure, he purchased in good faith, the result must be attributed to the policy of the law, based upon experience and the purpose to quiet title, which requires those whose legal rights are invaded to assert and enforce them, within the period fixed by the Legislature, or be forever barred.

The tracts, which are not in controversy, marked on the map, are as follows: "Clayton Moore to Jesse Sawyer," the portion of Devil's Gut Swamp lying west of the line G to H and tracts 9 and 10. Such disposition of them will be made in the decree, as the parties may agree upon. In drawing the decree, a reduced copy of the plat, known as "Peel's Survey," will be attached and made a part of the record. A certified copy of the decree will be registered in the office of the register of deeds of Martin county. Each party will pay their witnesses; the stenographer's compensation will be divided equally. The plaintiff will pay the court cost.